J-A07010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PAUL CAMIOLO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ERIE INSURANCE EXCHANGE D/B/A | : | No. 478 EDA 2018 |
| ERIE INSURANCE GROUP A/K/A ERIE | : | |
| INSURANCE COMPANY A/K/A ERIE | : | |
| INDEMNITY COMPANY | : | |

Appeal from the Judgment Entered January 10, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): July Term, 2015, No. 01750

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED APRIL 17, 2019**

Appellant, Paul Camiolo, appeals from the entry of judgment in favor of

Erie Insurance Exchange, d/b/a Erie Insurance Group, a/k/a/ Erie Insurance

Company, a/k/a Erie Indemnity Company (Erie Insurance) entered on January

10, 2018 following a bench trial on Appellant's complaint that Erie Insurance

exercised bad faith in handling his claim for underinsured motorist (UIM)

benefits.  We affirm.

We briefly summarize the facts and procedural history of this case as

follows.  On June 30, 2009, Appellant was involved in a motor vehicle accident

wherein he was struck from behind by another motorist.  He sustained injuries

to his left wrist and elbow.  Appellant filed a lawsuit against the other driver

and eventually settled for $50,000.00.  At the time of the accident, Erie

_____

*   Former Justice specially assigned to the Superior Court.

Insurance insured Appellant with a policy that provided $100,000.00 in UIM coverage. A doctor who performed an independent medical examination in conjunction with Appellant's claim against the motorist in February 2011 opined that Appellant's injuries were not caused by the accident. In March 2011, Appellant underwent surgery on his left elbow. Three months after the surgery, Appellant was involved in a motor vehicle accident with a deer, which aggravated his elbow. In April 2012, Appellant submitted a claim with Erie Insurance seeking his $100,000.00 policy limit for UIM benefits. In October 2012, Appellant's treating physician opined that Appellant sustained his injuries in the 2009 motor vehicle accident. In April 2013, Erie Insurance offered Appellant $7,500.00, after considering Appellant's prior $50,000.00 settlement. Thereafter, over the course of the next ten months, Erie Insurance increased its offer six times. In February 2014, Erie Insurance tendered, and Appellant accepted, the UIM policy limit of $100,000.00.

In July 2015, Appellant filed a bad faith claim against Erie Insurance. The trial court held a bench trial over the course of six days between May 15, 2017 and July 10, 2017 and ruled in favor of Erie Insurance. In an opinion filed on November 2, 2017, the trial court issued its findings of fact and conclusions of law. Appellant filed timely post-trial motions requesting judgment notwithstanding the verdict (JNOV) or a new trial. The trial court

held argument on the post-trial motions and denied relief by order entered on January 10, 2018. This timely appeal resulted.[1]

On appeal, Appellant presents the following issues for our review:

1. Whether the [trial c]ourt with respect to its bad faith analysis erroneously considered Erie [Insurance's] [t]rial counsel's intentions and motivations instead of the intentions and motivations of Erie Insurance [] when arriving at its decision by capriciously ignoring the Erie [Insurance] files and witnesses.

2. Whether the [trial c]ourt erroneously failed to find that Erie Insurance [] had deliberately concealed a medical report from [Appellant] and continued to make offers in an attempt to take advantage of its superior knowledge when trying to settle the case with [Appellant], thus acting in bad faith.

3. Whether the [trial c]ourt erred when [it] found that Erie Insurance [] did not take a double credit for the tortfeasor's liability limits in spite of the testimony of Erie Insurance['s] [c]laim [r]epresentative who testified that she took a double credit when evaluating [Appellant's] claim and the [trial c]ourt also took the double credit when analyzing the value of [Appellant's] claim.

4. Whether the [trial c]ourt erroneously failed to apply the adverse inference in favor of [Appellant] that had been [g]ranted to [Appellant] against Erie Insurance [] with respect to records which were not produced by Erie Insurance [] when deciding whether Erie Insurance [] had acted in bad faith.

_____

[1] Appellant filed a notice of appeal on February 1, 2018. On February 6, 2018, the trial court issued an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After receiving an extension from the trial court, Appellant filed a timely Rule 1925(b) statement. On June 5, 2018, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a), largely relying upon its rationale as set forth in its opinion filed on November 2, 2017.

5. Whether the [trial c]ourt erred when it erroneously prevented [Appellant] from obtaining the time and billing files of [Erie Insurance's] [l]aw [f]irm as it related to the underlying case and then allowed witnesses to testify about matters contained within those records over objection of counsel.

6. Whether the [trial c]ourt erred when it found that Erie Insurance [] had never rejected [Appellant's] UIM claim when Erie Insurance [] made counter offers which were rejections of Appellant's UIM claim.

7. Whether the [trial c]ourt erred when it based its findings on facts that did not exist and/or were not in evidence.

8. Whether the [trial c]ourt erroneously failed to enter a JNOV for [Appellant].

Appellant's Brief at 5-6.

We briefly summarize the sum of Appellant's arguments as follows. Appellant argues that Erie Insurance had a continuing duty to act in good faith when negotiating to settle his UIM claim. Appellant maintains that once he demonstrated clear liability, Erie Insurance demonstrated bad faith by: (1) offering low valuations; (2) ordering a second medical evaluation and intentionally withholding results that were favorable to Appellant; (3) twice crediting the third-party settlement with the driver of the 2009 accident; and, (4) violating its own policy by increasing offers that had not been countered by Appellant. Appellant contends that the trial court relied upon incorrect information or data outside of the record to arrive at its decision. Appellant also claims that the trial court's finding that Erie Insurance never denied coverage contravenes established contract law. As such, Appellant claims that he was entitled to JNOV or a new trial.

- 4 -

We adhere to the following standards:

The propriety of a JNOV is a question of law, and therefore, our scope of review is plenary. When the denial of JNOV is challenged on the basis that the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, as here, this Court reviews the evidentiary record and must conclude that the evidence was such that a verdict for the movant was beyond peradventure.

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standards of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a JNOV only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

*Corvin v. Tihansky*, 184 A.3d 986, 990 (Pa. Super. 2018) (internal citations and brackets omitted). Whereas, "when reviewing an order denying a motion for a new trial, we must determine whether the trial court clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case." *Brinich v. Jencka*, 757 A.2d 388, 395 (Pa. Super. 2000) (citation and internal quotations omitted).

An insured has a cause of action "if the court finds that the insurer has acted in bad faith toward the insured[.]" 42 Pa.C.S.A. § 8371. This Court has previously determined:

The Pennsylvania legislature did not provide a definition of bad faith, as that term is used in [S]ection 8371, nor did it set forth the manner in which an insured must prove bad faith. […T]his Court has ruled that, to succeed on a bad faith claim, the insured must present clear and convincing evidence to satisfy a two part

- 5 -

test: (1) the insurer did not have a reasonable basis for denying benefits under the policy, and (2) the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. There is a requisite level of culpability associated with a finding of bad faith. Merely negligent conduct, however harmful to the interests of the insured, is recognized by Pennsylvania courts to be categorically below the threshold required for a showing of bad faith. Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured. The fact-finder must consider all of the evidence available to determine whether the insurer's conduct was objective and intelligent under the circumstances.

A dishonest purpose or motive of self-interest or ill will is not a third element required for a finding of bad faith. A motive of self-interest or ill will may be considered in determining the second prong of the test for bad faith, *i.e.*, whether an insurer knowingly or recklessly disregarded its lack of a reasonable basis for denying a claim.

*Rancosky v. Washington Nat. Ins. Co.*, 130 A.3d 79, 92–93 (Pa. Super. 2015) (internal citations and quotations omitted).

In this case, the trial court found that Erie Insurance never denied Appellant's claim. Instead, it determined that "[b]y all accounts, Erie [Insurance's] investigation was vigorous; it sought and received numerous medical records, ordered independent medical examinations and sought to reconcile often conflicting or changing information, all the time communicating with [Appellant] and his attorney." Trial Court Opinion, 11/2/2017, at 13. It further opined that "the ten-month negotiation period under examination cannot be deemed unreasonable" where it was "undisputed that [Appellant's] treatment was off-again and on-again throughout this period, substantiating Erie [Insurance's] observation that [Appellant's] claim, from a medical standpoint, was a 'fluid file' with ongoing developments that complicated the

evaluation process." *Id.* at 14 (record citations omitted). As such, the trial court concluded that at "[e]ach step of the way, Erie [Insurance] acknowledged and credited new information and responded accordingly [] from the lapse of time between April 1, 2013 and February 7, 2014." *Id.* at 15-16. The trial court also methodically details the procedural timeline of Erie Insurance's six increasing offers based upon the information as it became available to Erie Insurance over the 10-month time period involved. *Id.* at 5-10.

We have carefully reviewed the certified record, the submissions of the parties, and the thorough opinions issued by the trial court in November 2, 2017 and June 5, 2018. Based upon our review, we conclude that the trial court did not err by finding in favor of Erie Insurance on Appellant's bad faith claim. Accordingly, there is no merit to Appellant's claim that he is entitled to JNOV or a new trial. Because the trial court's opinions adequately and accurately address the claims Appellant presents on appeal, we adopt the trial court's November 2, 2017 and June 5, 2018 opinions as our own. The parties are hereafter directed to include copies of the trial court's November 2, 2017 and June 5, 2018 opinions with all future filings pertaining to our disposition of this appeal.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/19

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL SECTION

| | | |
|---|---|---|
| PAUL CAMIOLO, | : | JULY TERM, 2015 |
| | : | |
| _Plaintiff_ | : | |
| | : | No. 1750 |
| v. | : | |
| | : | |
| ERIE INSURANCE EXCHANGE, | : | |
| | : | |
| _Defendants_ | : | 1925(b) Opinion |

**OPINION**

Colins, J.                                                                June, 2018

In July of 2015, plaintiff Paul Camiolo (Camiolo) filed a lawsuit against his insurer, charging defendant Erie Insurance Exchange[1] (Erie) with statutory bad faith in its handling of his underinsured motorist (UIM) claim. Following a bench trial on six days between May 15, 2017, and July 10, 2017, this court found in favor of the defendant Erie and on November 2, 2017, issued a memorandum and order memorializing its findings of fact and conclusions of law (Memo and Order). After briefing and oral argument, the court denied the plaintiff's post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. Plaintiff appeals.

**ISSUES RAISED ON APPEAL**

Is the appellant entitled to either judgment as a matter of law (JNOV) or a new trial because:

(1) The court impermissibly considered evidence of the plaintiff's intentions where, as a matter of law, a finding of Bad Faith must be predicated solely on the intentions of the defendant insurer?

---

[1] d/b/a Erie Insurance Group a/k/a Erie Insurance Company a/k/a Erie Indemnity Company.

Camiolo Vs Erie Insurance Exchange Etal-OPFLD

1

15070175000171

(2) The court failed to find from the evidence that the defendant deliberately concealed a medical report, a finding which would have impugned the defendant's intentions for the purpose of finding Bad Faith?

(3) The court impermissibly doubled the credit attributable to the proceeds of appellant obtained in settlement with the tortfeasor?

(4) The court failed to apply an adverse inference granted to appellant during the course of discovery as a sanction for the defendant's failure to produce certain documents?

(5) The court erroneously considered testimony about attorney time and billings of the defendant's counsel when the court had quashed appellant's subpoena for that evidence?

(6) The court erroneously found as a matter of fact that the defendant never rejected the appellant's UIM claim?

(7) The court impermissibly relied on erroneous facts regarding a meeting between counsel and the defendant's examining doctor and that doctor's testimony?

## BACKGROUND

The court addressed certain of the foregoing assignments of error in Memo and Order, a copy of which is appended to this opinion for reference. For the convenience of the reader, the *Findings of Fact/Conclusions of Law* therein are set forth verbatim below:

### FINDINGS OF FACT

1   On **June 30, 2009**, plaintiff Paul Camiolo (Camiolo) was involved a in motor vehicle accident in which his car was struck from behind by a vehicle driven by Weiwen Zhgen (Zhgen). Defendant Exhibit 1 (D-1) at CMS 2.

2   Camiolo filed a lawsuit against Zhen that was settled in Camiolo's favor on **March, 14, 2012**, for $50,000. N.T. 5/18/17 at 29.[2]

3   Camiolo was an insured by Erie under a Personal Auto Policy No. Q06-0115735 (Erie Policy) for the period of June 1, 2009 to June 1, 2010. DM0257-88.

4   On the day of Camiolo's accident, the Erie Policy provided $100,000 in Underinsured Motorist (UIM) coverage. *Id.*

---

[2] This action included bad faith claims that were dismissed by Stipulation in March of 2013. P-8.

2

In a **February 28, 2011**, report of his independent medical exam (IME) performed in connection with Camilo's July of 2009 claim for first party medical benefits (PIP), Dr. William H. Kirkpatrick stated:

> "However, I cannot clearly relate this condition [left cubital tunnel syndrome[3]] to his motor vehicle accident of nearly 2 years ago. He did not sustain any left elbow injury at the time of the motor vehicle accident. His symptoms were localized to left hand and wrist. Furthermore, progressive ulnar nerve[4] symptoms can be related to his employment as a computer consultant and can also be related to his newly diagnosed diabetes.
>
> . . .
>
> As stated, I cannot relate treatment for this cubital tunnel syndrome specifically to the motor vehicle accident."

DM0166; CMS0006.

In a letter dated **April 5, 2012**, Camiolo's attorney notified Erie of his UIM claim and presented a demand package seeking the policy limit of $100,000. DM0514-22.

In a report dated **October 12, 2012**, Dr. Thomas J. Gillon, Camiolo's treating surgeon, opined that the injuries to Camiolo's wrist and elbow were sustained in the accident in June of 2009. DM1289-90.

Dr. Gillon noted that about seven months earlier, on March 15, 2011, and after Dr. Kirkpatrick's February exam, Camiolo "underwent a left elbow ulnar nerve release in situ with medial epicondylectomy." (March 2011 Elbow Surgery). *Id.*

Three months after this surgery, Camiolo was in an auto accident involving a collision with a deer (deer accident). This incident aggravated symptoms of numbness and tingling in left fingers stemming from the ulnar neuropathy, but that these symptoms did "dissipate over time without any intervention." *Id.*

Dr. Gillon opined that Camiolo's symptoms, post-operative and post-deer-accident, were "not permanent and continue to get better as time goes on;" this conclusion was affirmed by the results of a new EMG and nerve conduction study from September 28, 2012. *Id.*

---

[3] "Cubital Tunnel Syndrome is a condition that involves pressure or stretching of the ulnar nerve (also known as the "funny bone" nerve), which can cause numbness or tingling in the ring and small fingers, pain in the forearm, and/or weakness in the hand. The ulnar nerve runs in a groove on the inner side of the elbow." American Society for Surgery of the Hand [http://www.assh.org/handcare/hand-arm-conditions/cubital-tunnel].

[4] The ulnar nerve is "a large superficial nerve of the arm that is a continuation of the medial cord of the brachial plexus, passes around the elbow superficially in a groove between the olecranon and the medial epicondyle of the humerus, and continues down the inner side of the forearm to supply the skin and muscles of the little-finger side of the forearm and hand." Miriam Webster [https://www.merriam-webster.com/medical/ulnar%20nerve]

3

Dr. Gillon stated that Camiolo would "still have some numbness in his small finger for an additional six months but I think it should get better to the point where it does not bother him any longer unless he develops a generalized motor and sensory peripheral neuropathy from his diabetes, which would be unrelated to his compressive neuropathy at the elbow." *Id.*

He stated further that Camiolo did not need further surgery, that he had "an excellent prognosis with respect to his left elbow ulnar neuropathy" and that he had "no functional deficits or disability with respect to his left elbow or hand from his ulnar neuropathy." *Id.*

In a **June 13, 2012,** conference call with defense counsel, Dr. Kirkpatrick acknowledged that he could not, to a reasonable degree of medical certainty, reject Dr. Gillon's opinion that Camiolo's injuries were related to the 2009 accident. DM0676.

In **March of 2013,** Erie received from defense counsel information that jury verdict research regarding the value of an ulnar nerve injury revealed that the claim had a total value of $50,000 to $75,000. DM1250-51; N.T. 05.22.17 at 23.

As of **April 1, 2013,** Erie's initial offer on Camiolo's UIM claim after taking credit for the $50,000 settlement remained at $7,500. DM2117.

Ten months later, in **February of 2014,** Erie tendered and Camiolo accepted the policy limits of $100,000. N.T. 5/18/17 at 30.

On **February 19, 2014,** Camiolo executed a General Release Agreement that included the following statement:

> "It is expressly understood and agreed that I, Paul Camiolo, my heirs, representatives, executors, administrators, successors, and assigns am/are not releasing the release from any and all claims of bad faith accruing from **April 1, 2013, to the present.**"

DM 1664-65 (emphasis added).

In the ten months between April 1, 2013, and February 7, 2014, the date of the final settlement, Erie increased its original $7,500 offer six times: **June 27, 2013 ($15,000)** (DM1673); **August 15, 2013 ($25,000)** (DM1702); **October 8, 2013 ($35,000)** (DM0626); **October 30, 2013 ($36,750)** (DM2607); **January 15, 2014 ($60,000)** (DM2046); and **February 7, 2014 ($100,000)** (DM1646). At no point during negotiations did Camiolo abandon his $100,000 demand.

In **July of 2015,** Camiolo filed the instant lawsuit charging Erie with statutory bad faith under 42 Pa. Stat. and Cons. Stat. Ann. § 8371 (West).[5]

---

[5] Section 8371 provides, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest

4

## OFFER OF JUNE 27, 2013 ($15,000)

On **March 26, 2013**, through its counsel, Erie advised Camiolo's attorney that the then outstanding offer of $7,500 remained in place because the insurer had received no new evidence, documents or facts that warranted an increase. DM2117-18; N.T. 05.16.17 at 31, 35; N.T. 05.18.17 at 122; N.T. 06.29.17 at 59.

This number assumed that (a) Camiolo's injuries were caused by the 2009 accident and (b) that the total value of Camiolo's claim was between $50,000 and $70,000, which, when discounting the $50,000 received in settlement from the tortfeasor, produced a range for Erie's liability of $0 to $20,000. DM1250; N.T. 05.15.17 at 91.

At this point, Erie had reviewed extensive medical records for Camiolo dating back to 1997, including the report of the independent medical exam performed on February 28, 2011, by Dr. Kirkpatrick and the October 12, 2012, report of Dr. Gillon, DM0185-88; DM1284; DM1312-31. N.T. 05.15.17 at 78-79; N.T. 05.16.17 at 32; N.T. 05.22.17 at 26-27.

Dr. Gillon had related Camiolo's injuries to the 2009 accident. Dr. Kirkpatrick had conceded that he could not refute Dr. Gillon's opinion on causation. FF Para. 5, *supra.*

On **June 6, 2013**, Erie received additional information during Camiolo's lawsuit against the tortfeasor. Discovery revealed the new information that, notwithstanding Dr. Gillon's prognosis to the contrary in October of 2012, Camiolo had had *additional surgery* on his left wrist in March of 2013 (March 2013 Wrist Surgery), two months earlier and three years and nine months after the initial accident. CMS0307; DM1673; N.T., 05.15.2017, at 89; N.T. 05.18.17 at 110-11.

Dr. Gillon opined further that the March 2013 Wrist Surgery was causally related to the 2009 accident and that Camiolo would be partially disabled from employment for approximately six months, but was expected to make a full recovery. CMS0283-85; DM0658.

On **June 27, 2013**, having reviewed this new information, Erie increased its offer to **$15,000**, citing Erie's "continuing duty to re-evaluate," and noting that even though Erie did not yet have the medical records of the surgery, "an additional surgery [in March 2013] is a significant intervening development." DM1272; DM0658; DM1673; N.T. 05.15.17 at 91; N.T. 05.18.17 at 56; N.T. 05.22.17 at 27-29; N.T. 06.29.17 at 64.

---

plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

## OFFER OF AUGUST 15, 2013 ($25,000)

Having increased its offer to $15,000, Erie determined that it needed further medical investigation of causation regarding the March 2013 Wrist Surgery. N.T. 05.22.17 at 29-30.

On **August 5, 2013**, Dr. Barry Snyder performed an independent medical examination of Camiolo to determine if the March 2013 Wrist Surgery was related to the 2009 accident. DM1687; DM1702; N.T. 05.18.17 at 62.

Snyder opined that Camiolo's TFCC[6] repair (the March 2013 Wrist Surgery) was "likely attributable" to the 2009 accident, that his treatment had "not matured," and that Camiolo would "never return to 100 percent functionality." DM1687-89, N.T. 05.15.17 at 94; N.T. 05.18.17 at 64; N.T. 05.22.17 at 120.

On **August 15, 2013**, on the basis Snyder's opinion, Erie increased its offer to Camiolo to **$25,000**, premised on a total recovery of $75,000 to $80,000. *Id.*; DM1702; N.T. 05.15.17 at 95-96; N.T. 05.16.17 at 66; N.T. 05.18.17 at 66, 72; N.T. 05.22.17 at 29-30.

## OFFER OF OCTOBER 3, 2013 ($35,000)

On **September 18, 2013**, defense counsel reported to Erie his discussions with Dr. Snyder in which Dr. Snyder stated that the ligament injury and the resulting surgery may be attributable to the 2009 accident and may cause some permanent residuals. DM1747.

On **September 23, 2013**, Erie also reviewed records subpoenaed from Orthopedic Surgery and Rehabilitation Associates (Rehab Associates), indicating that Camiolo was enjoying "excellent progress" with significant improvement to the pain in his left hand, that he had "no current complaints." DM1766-68; N.T. 05.22.17 at 36; N.T. 06.29.17 at 101.

Dr. Gillon discharged Camiolo "PRN"[7] in **September of 2013**. DM0619-20; N.T. 05.18.17 at 19.

On or about **October 3, 2013**, defense counsel provided to plaintiff's counsel Dr. Snyder's written IME report of his August 5, 2013, independent medical exam. N.T. 06.29.17 at 88.

On **October 3, 2013**, defense counsel transmitted to plaintiff's counsel a **new offer of $35,000**, which was rejected with no counteroffer a week later. DM0626; DM1343; N.T. 05.16.17 at 74; N.T. 05.18.17 at 77-78; N.T. 05.22.17 at 37-38.

---

[6] Triangular Fibrocartilage Complex refers to the ligamentous and cartilaginous structures that suspend the distal radius and ulnar carpus from the distal ulna. Injuries to the TFCC present as ulnar-side wrist pain. Medscape [https://emedicine.medscape.com/article/1240789-overview].

[7] *Pro re nata.* Latin for the present matter; under present circumstances; as needed —abbreviation prn —used in medical prescriptions. Miriam Webster (URL: https://www.merriam-webster.com/dictionary/pro%20re%20nata).

## OFFER OF OCTOBER 30, 2013 ($36,750)

38  Having received additional information from the plaintiff about $1,750 in wage loss, Erie increased its **October 8, 2013, offer to $36,750.** DM2607; DM2046; N.T. 05.18.17 at 79; N.T. 05.22.17 at 42; N.T. 06.29.17 at 109.

## OFFER OF JANUARY 15, 2014 ($60,000)

39  In his **October 24, 2013,** deposition, Dr. Gillon testified that Camiolo experienced a good recovery after both surgeries; he also acknowledged Camiolo's pre-existing ulnar neuropathy. DM0619-20.

40  On **November 12, 2013,** however, plaintiff's counsel notified defense counsel that Camiolo had suffered a recent setback to his injuries while helping his aunt move to a new residence. DM0803.

41  On **November 27, 2013,** defense counsel reported to Erie that Dr. Gillon had examined Camiolo again and concluded that he indeed had suffered a relapse and loss of grip strength and that he might need injections in the future. DM1396.

42  On **December 13, 2013,** defense counsel received Dr. Gillon's December 3, 2013, supplemental report stating that: (a) Camiolo had been doing well until two months prior; (b) he had started regressing; (c) Dr. Gillon recommended that Camiolo wear a wrist brace; (d) there was no guarantee that Camiolo would be pain free for the rest of his life; and (e) if the pain was "extremely severe," Camiolo may need additional surgery. DM1397; N.T. 05.22.17 at 40, 52-54.

43  On **December 23, 2013,** Dr. Snyder was deposed.

44  On **January 10, 2014,** following Dr. Gillon's supplemental deposition on that day, Erie's file notes recount that Camiolo: (a) now had a different prognosis than he had at the time of his discharge in September of 2013; (b) had undergone a wrist injection on December 11, 2013; (c) suffered a relapse that was triggered when helping his aunt move; (d) possibly will require further treatment, including bone shortening surgery as "a last resort;" and (e) may suffer recurring pain throughout his life. DM1433; N.T. 05.16.17 at 79-82; N.T. 05.18.17 at 112-13.

45  On the basis of the foregoing, defense counsel opined that Erie's offer should be closer to the plaintiff's demand. DM1687.

46  On **January 15, 2014, Erie increased its offer to $60,000.** DM2046. It was rejected with no counteroffer on January 20, 2014. DM1440; N.T. 05.18.17 at 86-89; N.T. 05.22.17 at 56-57.

7

On or about **January 24, 2014**, plaintiff produced for the first time a journal dating back to December of 2012 noting that his current symptoms were comparable to those he experienced when he was first injured four years earlier. DM2008; N.T. 05.18.17 at 18; N.T. 06.29.17 at 120.

On **January 29, 2014**, the Camiolo's attorney advised defense counsel that Camiolo had seen Dr. Gillon that same day, that the strength in Camiolo's left hand had regressed even further, and that Dr. Gillon had ordered an MR Arthrogram.[8] DM2597; N.T. 05.16.17 at 8-9; N.T. 05.22.17 at 59, 110.

Based on the foregoing new information, Erie offered the **$100,000 UIM policy limits on February 7, 2014**, which Camiolo accepted. DM1646; N.T. 05.18.17 at 97.

## CONCLUSIONS OF LAW

Erie never denied plaintiff's UIM claim.

The record contains no clear and convincing evidence that during the period April 1, 2013, to February 7, 2014, Erie:

  -failed to communicate with its insured or his counsel;
  -failed to investigate;
  -caused an unreasonable delay in handling the plaintiff's claim; or
  -lacked a reasonable basis for any of its settlement offers.

In short, the record contains no clear and convincing evidence that Erie did not have reasonable basis for denying benefits[9] under policy and knew or recklessly disregarded any lack of a reasonable basis in negotiating the settlement of the plaintiff's claim.

On the basis of the foregoing record, and as explained in the discussion below, the court finds that plaintiff has failed to establish that Erie acted in bad faith in violation of Pennsylvania's Bad Faith Statute in the period from April 1, 2013, until February 7, 2014, when Erie offered and Camiolo accepted the policy limits.

---

[8] An arthrogram is the "[i]maging of a joint following the introduction of a contrast agent into the joint capsule to enhance visualization of the intra-articular structures." Farlex Partner Medical Dictionary © Farlex 2012, https://medical- dictionary.thefreedictionary.com/arthrogram.

[9] The claim was never "denied." Only the valuation was disputed.

## II. DISCUSSION ON APPEAL

The foregoing findings were based on the court's review of the considerable record created at trial and on its credibility judgments as to each witness in light of the facts and circumstances that emerged. They reflect this court's judgment that the plaintiff failed to show with clear and convincing evidence that in the ten months between April 1, 2013, and February 7, 2014, the insurer did not have a reasonable basis for its decisions regarding plaintiff's claim. *Berg v. Nationwide Mut. Ins. Co, Inc.*, 713 MDA 2015, 18 WL 17055274, *4 (Pa. Super. April 9, 2018) (affirming that a bad faith claim must be supported by clear and convincing evidence that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim); *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017) (same); *Grossi v. Travelers Pers. Ins. Co.*, 2013 PA Super 284, 79 A.3d 1141, 1165 (2013) (stating that plaintiff's heavy burden requires showing that "the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether the defendants acted in bad faith").

On appeal this court must determine "whether its factual findings are supported by the evidence and whether the court made a legal error." *Stokes v. Gary Barbera Enterprises, Inc.*, 2001 PA Super 239, 783 A.2d 296, 297 (2001) (internal citation omitted). In so doing, the court looks to the legal principles that guide decisions on motions for judgment notwithstanding a verdict (JNOV) and for a new trial.

A JNOV may be entered if, after considering the evidence supporting the verdict and giving the verdict winner the benefit of the doubt, the trial court finds that the evidence was such

9

that no two reasonable minds could disagree that the case should have been decided in favor of the movant. *B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*, 2016 PA Super 202, 148 A.3d 454, 463 (2016), *appeal denied*, 169 A.3d 9 (Pa. 2017). That is, the trial court must find that the movant is entitled to judgment as a matter of law and/or that even if all factual inferences are decided adverse to the movant, a verdict for the movant was beyond peradventure. *B.G. Balmer & Co. v. Frank Crystal & Co., Inc., supra.*

The decision to grant or deny a motion for a new trial, on the other hand, lies in the trial court's discretion, absent "clear and palpable" abuse of discretion or error of law that affects the outcome of the case. *Joseph v. Scranton Times L.P.*, 2008 PA Super 217, 959 A.2d 322, 333 (2008), *Brinich v. Jencka*, 2000 PA Super 209, 757 A.2d 388, 395 (2000). When evaluating the merits of a request for a new trial, the court first determines if a mistake was made at trial. If mistakes were made, the court then determines whether the mistake or mistakes provide a sufficient basis for granting a new trial. *Flenke v. Huntington*, 2015 PA Super 50, 111 A.3d 1197, 1199–2000 (2015), *citing Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1121 (2000). The court's determination must not be manifestly unreasonable, contrary to law or informed by partiality, prejudice, bias or ill will. *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116 (2000), *citing Morrison v. Com., Dep't of Pub. Welfare, Office of Mental Health (Woodville State Hosp.)*, 538 Pa. 122, 646 A.2d 565, 571–72 (1994).

These principles in mind, the court addresses below four of the six issues raised on appeal, namely, those numbered (numbered 1, 4, 5 and 7). With respect to the remaining two (numbered 2 and 5), the court rests on its discussions in its original findings, a copy of which, as mentioned, is appended hereto.

10

**No. 1 Did the court impermissibly consider evidence of the plaintiff's intentions where, as a matter of law, a finding of Bad Faith must be predicated solely on the intentions of the defendant insurer?**

Before trial, plaintiff introduced a motion *in limine* to preclude, *inter alia*, any evidence of the conduct of the insured/plaintiff. N.T., 05.15.2017, at 41. Counsel argued that since liability in a bad faith claim rests on the carrier's, not the insured's, conduct, evidence of the plaintiff's conduct should be precluded. The court denied the motion, reasoning that if such evidence casts light on the reasons the defendant acted as it did, it was relevant and admissible. *Id.* at 48. [10]

Plaintiff's proposition conflates a rule of law with a rule of evidence. It is true that plaintiff's claim of bad faith turns on the insurer's conduct, not that of the plaintiff. *Mohney v. Am. Gen. Life Ins. Co.*, 2015 PA Super 113, 116 A.3d 1123, 1138 (2015). It is not true, as plaintiff suggests, that evidence of the plaintiff's conduct is irrelevant. Pa.R.E. 401 provides that evidence is **relevant** if it has any tendency to make a determining fact more or less probable than it would be without the evidence. As a matter of relevance, it is plain that evidence of plaintiff's counsel's influences on Erie's conduct is germane to the question of defendant's state of mind and culpability; plaintiff offered no argument to the contrary nor has he pointed to any evidence that unfairly prejudiced his claim because it was admitted. As a matter of law, the court's ruling on this ground is sound and plaintiff's generalized objection is baseless.

---

[10] Much of the argument arising from plaintiff's proposition concerned his *motion in limine* to preclude the testimony of plaintiff's counsel, not the testimony of the plaintiff about his own conduct. N.T., 05.15.2017, at 42-47. As it happened, plaintiff's counsel did not testify.

11

**No. 3   Did the court err in failing to apply an adverse inference granted to appellant during the course of discovery as a sanction for the defendant's failure to produce certain documents?**

On December 21, 2016, another court in this matter granted plaintiff's motion for sanctions because Erie failed to comply with an Order dated October 5, 2016.[11]  The order stated,

> **"Plaintiff, Paul Camiolo, is granted an Adverse Inference regarding those documents identified in Plaintiff's Motion for Sanctions that have not been produced by Defendant [Erie] in accordance with this Court's Order of October 5, 2016."**

The documents in question concerned Erie's policies, procedures and practices, and training and course material related to Erie's claims handling and settlements, issues of privacy, and its litigation.  Para. 33, *Motion of Plaintiff, Paul Camiolo, for Sanctions Against Defendant Erie Insurance Exchange d/b/a Erie Insurance Group a/k/a Erie Insurance Company a/k/a Erie Indemnity Company for Failure to Comply With the Court's Order of October 5, 2016* (Motion for Sanctions).

On appeal, plaintiff argues that the December 21, 2016, Order was binding on the trial court and its failure to apply a case-determinative adverse inference favoring the plaintiff is an error of law or an abuse of discretion.  This argument is without foundation.  First, nothing on the face of the December 17, 2016, order itself mandates that an adverse inference against the defendant, if credited, should determine the outcome of the case.

Second, and more to the point, plaintiff misconstrues the law of "adverse inferences."  An adverse inference allows, but does not require, the factfinder to infer an elemental fact from proof

---

[11] The order directed the defendant within thirty days to provide supplemental responses to plaintiff's interrogatories and request for production of documents.

12

of a basic fact. *Com. v. MacPherson*, 561 Pa. 571, 752 A.2d 384 (2000). An adverse inference instruction is an evidentiary device that "is no more than a logical tool enabling the trier of fact to proceed from one fact to another, if the trier believes that the weight of the evidence and the experiential accuracy of the inference warrant so doing." *N.* 620 Pa. 345, 67 A.3d 1194 (2013). As a trier of fact, this court was well within its discretion to assess the effect any adverse inference permitted by the December 21, 2016, against all the evidence of record, including making the necessary credibility assessments. Plaintiff's contention is contrary to law and is without merit.

### No. 4 Did the court erroneously consider testimony about attorney time and billings of the defendant's counsel when the court had quashed appellant's subpoena for that evidence?

In his 1925b statement of errors complained of on appeal, the plaintiff challenges the court's decision to bar his attempt to obtain the time and billing files of M&P "as it related to the underlying case," while at the same time allowing "witnesses to testify about information contained in those records over the objection of Plaintiff."[12] Item 5, *Plaintiff, Paul Camiolo's, Concise Statement of Matters Complained of on Appeal in Accordance with* Pa.R.A.P. 1925(b).

Plaintiff's refers to the testimony of witnesses Robert J. Cahall and Scott J. Tredwell, the attorneys who worked for the firm law firm of McCormick & Priore (M&P), Erie's counsel in plaintiff's PIP and UIM claims files. This firm was the subject of defendant's motion to quash

---

[12] The issue was framed somewhat differently in plaintiff's post-trial motion in which he contended that, in light of those rulings, the court erred in permitting defense counsel at trial to question M&P's attorneys about "letters, notes and memoranda concerning conversations with Dr. Barry Snyder, correspondence to Dr. Snyder and others, instructions to subordinates and conversations with Erie Adjustors and Supervisors which could have been used to cross examine Counsel on those points . . ." Item 12, Plaintiff, *Paul Camiolo's, Post Trial Motions* (Control No. 17111861).

13

plaintiff's pre-trial subpoena for its custodian of records to produce the material in plaintiff's PIP and UIM claims. The court granted Erie's motion. N.T., 05.15.2017, at 60-62. Much earlier, in September of 2016, another court granted defendant's motion to quash essentially the very same subpoena, at which time the underlying PIP and UIM actions had been concluded and the documents in question had been produced. N.T., 05.15.2017, at 60-61.

The court was well within its discretion in granting the motion to quash a subpoena that had been granted once before, sought documents already provided, and the grant of which caused no prejudice to the plaintiff. *Slusaw v. Hoffman*, 2004 PA Super 354, 861 A.2d 269, 272 (2004) (absent abuse, rulings on motions to quash rest in the discretion of the court).

The court searched the record to find a basis for appeal arising out of the court's decision to quash plaintiff's subpoena. First, plaintiff presented no evidence or argument that changed circumstances that warranted revisiting the order granting defendant's post-discover motion to quash the same subpoena that has been quashed eight months earlier. The UIM and PIP claims had been resolved prior to the bad faith case, and the scope of the bad faith claim by stipulation of counsel was confined to defendant's conduct in a ten month period following the UIM settlement. There is no evidence of record that the requested documents ultimately were unavailable.

Second, attorneys Cahall and Tredwell were examined and cross-examined. N.T., 06.29.2017 and N.T., 07.10.2017. Plaintiff's counsel did not object to questions on direct examination referring to records concerning attorney fees or time. In turn, plaintiff's counsel encountered no objections on this ground to his questions about the attorneys' likely billing habits during the relevant period. *E.g.* N.T., 06.29.2017, at 114, 127. The court's decision on

14

the eve of trial to grant defendant's motion to quash was well within its discretion and the record contains no evidence that the plaintiff suffered prejudice as a result, nor did plaintiff claim any when submitting his findings of fact and conclusions of law.[13] *Plaintiff's; Paul Camiolo, Brief Re; The Liability Phase of the Trial*, filed Sept. 2, 2017.

### No. 6 Did the court impermissibly rely on erroneous facts regarding a meeting between counsel and the defendant's examining doctor and that doctor's testimony?

In his post-trial motion, plaintiff faulted the court for relying on errors in its findings of fact. At oral argument, plaintiff's counsel identified two errors. First, referring to finding of fact no. 33, he contends that the court erred in finding that there had been a conference between defense counsel and Dr. Snyder in September of 2013, when in fact, the conference occurred in August. Second, he contends that the court's statement that Dr. Snyder was deposed in December of 2013 is simply wrong because Dr. Snyder was not deposed. N.T., 12/19/2017, at 608. The court disagrees on the first contention and, on the second, concedes an error.

**Finding of fact no. 33** states:

> "On September 18, 2013, defense counsel reported to Erie his discussion with Dr. Snyder in which Dr. Snyder stated that the ligament injuries and the resulting surgery may be attributable to the 2009 accident and may cause some residuals."

This finding refers to a letter entitled "Pre-Trial Report" and dated September 18, 2013, from M&P attorney, Robert J. Cahall, to Nicole Beerman of Erie Insurance. Exhibit DM1747. This letter is a status report on plaintiff's UIM claim and contains the following paragraph:

---

[13] Plaintiff's counsel objected to the testimony of attorneys Cahall and Tredwell on the ground that it implicated an "advice of counsel" defense that the defendant had not affirmatively pled and therefore was waived. N.T., 06.29.2017, at 9. Such a defense bears on whether a defendant's attorney-client privilege is waived when it is asserted; it is present when the defendant answers the complaint with the allegation that it acted reasonably when investigating plaintiff's claim. *Jones v. Nationwide Ins. Co.*, 2000 U.S.Dist.Lexis 18823, *2 (MD Pa. July 20, 2000). Waiver of the privilege was not an issue in the testimony of these two attorneys.

> "We have discussed this procedure [March 25, 2013 wrist surgery] at length, and an IME with Dr. Snyder was completed to assess the ligament claims. Dr. Snyder's report is currently pending. However, as advised our preliminary discussions with him disclosed that Dr. Snyder believes that the ligament injury and resulting surgery may be attributed to his accident and may cause some permanent residuals."

DM1749 at page 3.

Plaintiff's complaint regarding finding no. 33 is baseless. The finding states merely what defense counsel reported to Erie on September 18, 2013. It states that defense counsel conferred with Dr. Snyder, but does not state on which date. Neither of these facts is disputed. Whether the "conference" occurred in August, as plaintiff argued (N.T., 12/19/2017, at 6), or some other day, is of no consequence. The significance of the statement is that as of September 18, 2013, Dr. Snyder's views were part of Erie's deliberations, as already addressed in findings Nos. 30-32 regarding the results of Dr. Snyder's IME. In this regard, the finding is an accurate reflection of the record.

**Finding of fact no. 43**, on the other hand, erroneously states that Dr. Snyder was deposed and in this plaintiff correct. The question for the court, then, is whether this mistake provides a sufficient basis for granting a new trial. *Flenke v. Huntington*, 111 A.3d at 1199-2000. After a focused review of the record, the court respectfully submits that there is no evidence that the error was "manifestly unreasonable, contrary to law or informed by partiality, prejudice, bias or ill will." *Harmon*, 756 A.2d at 1121-23. The import of the related findings, nos. 39 to 46, is that in the fall of 2014, the plaintiff's treating physician, Dr. Gillon, had come to the conclusion that the plaintiff's condition had worsened and that his injuries likely were permanent, a conclusion that prompted defense counsel to advise Erie to increase its offer, advice that Erie accepted. Finding Nos. 45-46. Dr. Snyder's views, addressed elsewhere, are consistent with Dr. Gillon's. Findings

16

Nos. 30 and 31. There is no indication that the court relied on any real or imagined Snyder deposition in reaching its conclusions. This finding, as defense counsel described it, was a "scrivener's error" that had no bearing on the outcome of the case. N.T., 12/19/2017, at 20. It provides no basis for awarding a new trial.

## III. CONCLUSION

Fundamentally, plaintiff contends that no two reasonable minds could disagree that the weight of the record evidence compels a verdict in his favor. The record demonstrates otherwise, containing as it does considerable back-and-forth debate about value, the exact injuries involved and the plaintiff's changing prognosis over time. Taking into consideration the voluminous record and the court's credibility determinations, this court concluded that reasonable minds could and, indeed, did disagree about whether Erie's deliberations, valuations, and its conclusions lacked a reasonable basis. Put another way, the court found that the plaintiff's failed to meet his burden with "clear and convincing" to the contrary.

Also, the court in its exercise of discretion committed no error of law concerning the operation at trial of any "adverse inference." The record shows no abuse of discretion in the court's decision to grant the defendant's pre-trial motion to quash plaintiff's subpoena of record related to the closed PIP and UIM claims or in its subsequent supervision of counsels' examination and cross-examination of Erie's attorneys. Finally, there is no evidence that the court's erroneous statement regarding a deposition by Dr. Snyder affected the outcome of the case.

17

For foregoing reasons and the reasons set forth in the court's memorandum and order of November 2, 2107, the court respectfully submits that the verdict in this matter be affirmed.

BY THE COURT:

MARY D. COLINS, J.

DATE: 6/5/18

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL SECTION

| | |
|---|---|
| PAUL CAMIOLO, | JULY TERM, 2015 |
| *Plaintiff* | |
| v. | No. 1750 |
| ERIE INSURANCE EXCHANGE d/b/a ERIE INSURANCE GROUP a/k/a ERIE INSURANCE COMPANY a/k/a ERIE INDEMNITY COMPANY, | |
| *Defendant* | Findings of Fact/Conclusions of Law |

## MEMORANDUM AND ORDER

Colins, J.                                                              October, 2017

In July of 2015, plaintiff Paul Camiolo (Camiolo) filed a lawsuit against his insurer, Erie Insurance Exchange[1] (Erie), charging Erie with statutory bad faith in its handling of his underinsured motorist (UIM) claim. The matter was tried before this court on six days between May 15, 2017, and July 10, 2017.

The court has reviewed the notes of testimony and the exhibits admitted to the record, along with the parties' respective proposed findings of fact, conclusions of law, and memoranda. Having evaluated the evidence and adjudged the credibility of all the witnesses, the court finds in accordance with the findings of fact (FF) and conclusions of law set forth

---

[1] d/b/a Erie Insurance Group a/k/a Erie Insurance Company a/k/a Erie Indemnity Company.

1

Camiolo Vs Erie Insurance Exchange Etal-ORDMM

15070175000147

below that the plaintiff has failed to establish his bad faith claim by clear and convincing evidence. Accordingly, a verdict is entered in favor of the defendant Erie.

## FINDINGS OF FACT

1. On **June 30, 2009**, plaintiff Paul Camiolo (Camiolo) was involved a in motor vehicle accident in which his car was struck from behind by a vehicle driven by Weiwen Zhgen (Zhgen). Defendant Exhibit 1 (D-1) at CMS 2.

2. Camiolo filed a lawsuit against Zhen that was settled in Camiolo's favor on **March, 14, 2012**, for $50,000. N.T. 5/18/17 at 29.[2]

3. Camiolo was an insured by Erie under a Personal Auto Policy No. Q06-0115735 (Erie Policy) for the period of June 1, 2009 to June 1, 2010. DM0257-88.

4. On the day of Camiolo's accident, the Erie Policy provided $100,000 in Underinsured Motorist (UIM) coverage. *Id.*

5. In a **February 28, 2011**, report of his independent medical exam (IME) performed in connection with Camilo's July of 2009 claim for first party medical benefits (PIP), Dr. William H. Kirkpatrick stated:

   > "However, I cannot clearly relate this condition [left cubital tunnel syndrome[3]] to his motor vehicle accident of nearly 2 years ago. He did not sustain any left elbow injury at the time of the motor vehicle accident. His symptoms were localized to left hand and wrist. Furthermore, progressive ulnar nerve[4]

---

[2] This action included bad faith claims that were dismissed by Stipulation in March of 2013. P-8.

[3] "Cubital Tunnel Syndrome is a condition that involves pressure or stretching of the ulnar nerve (also known as the "funny bone" nerve), which can cause numbness or tingling in the ring and small fingers, pain in the forearm, and/or weakness in the hand. The ulnar nerve runs in a groove on the inner side of the elbow." American Society for Surgery of the Hand [http://www.assh.org/handcare/hand-arm-conditions/cubital-tunnel].

[4] The ulnar nerve is "a large superficial nerve of the arm that is a continuation of the medial cord of the brachial plexus, passes around the elbow superficially in a groove between the olecranon and the medial epicondyle of the humerus, and continues down the inner side of the forearm to supply the skin and muscles of the little-finger side of the forearm and hand." Miriam Webster [https://www.merriam-webster.com/medical/ulnar%20nerve]/

2

symptoms can be related to his employment as a computer consultant and can also be related to his newly diagnosed diabetes.

As stated, I cannot relate treatment for this cubital tunnel syndrome specifically to the motor vehicle accident."

DM0166; CMS0006.

6    In a letter dated **April 5, 2012**, Camiolo's attorney notified Erie of his UIM claim and presented a demand package seeking the policy limit of $100,000. DM0514-22.

7    In a report dated **October 12, 2012**, Dr. Thomas J. Gillon, Camiolo's treating surgeon, opined that the injuries to Camiolo's wrist and elbow were sustained in the accident in June of 2009. DM1289-90.

8    Dr. Gillon noted that about seven months earlier, on March 15, 2011, and after Dr. Kirkpatrick's February exam, Camiolo "underwent a left elbow ulnar nerve release in situ with medial epicondylectomy." (March 2011 Elbow Surgery). *Id.*

9    Three months after this surgery, Camiolo was in an auto accident involving a collision with a deer (deer accident). This incident aggravated symptoms of numbness and tingling in left fingers stemming from the ulnar neuropathy, but that these symptoms did "dissipate over time without any intervention." *Id.*

10   Dr. Gillon opined that Camiolo's symptoms, post-operative and post-deer-accident, were "not permanent and continue to get better as time goes on;" this conclusion was affirmed by the results of a new EMG and nerve conduction study from September 28, 2012. *Id.*

11   Dr. Gillon stated that Camiolo would "still have some numbness in his small finger for an additional six months but I think it should get better to the point where it does not bother him any longer unless he develops a generalized motor and sensory peripheral neuropathy from his diabetes, which would be unrelated to his compressive neuropathy at the elbow." *Id.*

3

He stated further that Camiolo did not need further surgery. that he had "an excellent prognosis with respect to his left elbow ulnar neuropathy" and that he had "no functional deficits or disability with respect to his left elbow or hand from his ulnar neuropathy." *Id.*

In a **June 13, 2012,** conference call with defense counsel, Dr. Kirkpatrick acknowledged that he could not, to a reasonable degree of medical certainty. reject Dr. Gillon's opinion that Camiolo's injuries were related to the 2009 accident. DM0676.

In **March of 2013,** Erie received from defense counsel information that jury verdict research regarding the value of an ulnar nerve injury revealed that the claim had a total value of $50,000 to $75,000. DM1250-51; N.T. 05.22.17 at 23.

As of **April 1, 2013,** Erie's initial offer on Camiolo's UIM claim after taking credit for the $50,000 settlement remained at $7,500. DM2117.

Ten months later, in **February of 2014,** Erie tendered and Camiolo accepted the policy limits of $100,000. N.T. 5/18/17 at 30.

On **February 19, 2014,** Camiolo executed a General Release Agreement that included the following statement:

> "It is expressly understood and agreed that I, Paul Camiolo. my heirs, representatives, executors, administrators. successors. and assigns am/are not releasing the release from any and all claims of bad faith accruing from **April 1, 2013, to the present.**"

DM 1664-65 (emphasis added).

In the ten months between April 1, 2013, and February 7, 2014, the date of the final settlement, Erie increased its original $7,500 offer six times: **June 27, 2013 ($15,000)** (DM1673); **August 15, 2013 ($25,000)** (DM1702); **October 8, 2013 ($35,000)** (DM0626); **October 30, 2013 ($36,750)** (DM2607); **January 15, 2014 ($60,000)** (DM2046); and

**February 7, 2014 ($100,000)** (DM1646). At no point during negotiations did Camiolo abandon his $100,000 demand.

In **July of 2015**, Camiolo filed the instant lawsuit charging Erie with statutory bad faith under 42 Pa. Stat. and Cons. Stat. Ann. § 8371 (West).[5]

## OFFER OF JUNE 27, 2013 ($15,000)

On **March 26, 2013**, through its counsel, Erie advised Camiolo's attorney that the then outstanding offer of $7,500 remained in place because the insurer had received no new evidence, documents or facts that warranted an increase. DM2117-18; N.T. 05.16.17 at 31, 35; N.T. 05.18.17 at 122; N.T. 06.29.17 at 59.

This number assumed that (a) Camiolo's injuries were caused by the 2009 accident and (b) that the total value of Camiolo's claim was between $50,000 and $70,000, which, when discounting the $50,000 received in settlement from the tortfeasor, produced a range for Erie's liability of $0 to $20,000. DM1250; N.T. 05.15.17 at 91.

At this point, Erie had reviewed extensive medical records for Camiolo dating back to 1997, including the report of the independent medical exam performed on February 28, 2011, by Dr. Kirkpatrick and the October 12, 2012, report of Dr. Gillon, DM0185-88; DM1284; DM1312-31. N.T. 05.15.17 at 78-79; N.T. 05.16.17 at 32; N.T. 05.22.17 at 26-27.

Dr. Gillon had related Camiolo's injuries to the 2009 accident. Dr. Kirkpatrick had conceded that he could not refute Dr. Gillon's opinion on causation. FF Para. 5, *supra.*

---

[5] Section 8371 provides, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

5

On **June 6, 2013**, Erie received additional information during Camiolo's lawsuit against the tortfeasor. Discovery revealed the new information that, notwithstanding Dr. Gillon's prognosis to the contrary in October of 2012, Camiolo had had *additional surgery* on his left wrist in March of 2013 (March 2013 Wrist Surgery), two months earlier and three years and nine months after the initial accident. CMS0307; DM1673; Day1 at 89; N.T. 05.18.17 at 110-11.

Dr. Gillon opined further that the March 2013 Wrist Surgery was causally related to the 2009 accident and that Camiolo would be partially disabled from employment for approximately six months, but was expected to make a full recovery. CMS0283-85; DM0658.

On **June 27, 2013**, having reviewed this new information, Erie increased its offer to **$15,000**, citing Erie's "continuing duty to re-evaluate," and noting that even though Erie did not yet have the medical records of the surgery. "an additional surgery [in March 2013] is a significant intervening development." DM1272; DM0658; DM1673; N.T. 05.15.17 at 91; N.T. 05.18.17 at 56; N.T. 05.22.17 at 27-29; N.T. 06.29.17 at 64.

## OFFER OF AUGUST 15, 2013 ($25,000)

Having increased its offer to $15,000, Erie determined that it needed further medical investigation of causation regarding the March 2013 Wrist Surgery. N.T. 05.22.17 at 29-30.

On **August 5, 2013**, Dr. Barry Snyder performed an independent medical examination of Camiolo to determine if the March 2013 Wrist Surgery was related to the 2009 accident. DM1687; DM1702; N.T. 05.18.17 at 62.

6

31   Snyder opined that Camiolo's TFCC[6] repair (the March 2013 Wrist Surgery) was "likely attributable" to the 2009 accident, that his treatment had "not matured," and that Camiolo would "never return to 100 percent functionality." DM1687-89, N.T. 05.15.17 at 94; N.T. 05.18.17 at 64; N.T. 05.22.17 at 120.

32   On **August 15, 2013,** on the basis Snyder's opinion, Erie increased its offer to Camiolo to **$25,000,** premised on a total recovery of $75,000 to $80,000. *Id.*; DM1702; N.T. 05.15.17 at 95-96; N.T. 05.16.17 at 66; N.T. 05.18.17 at 66, 72; N.T. 05.22.17 at 29-30.

## OFFER OF OCTOBER 3, 2013 ($35,000)

33   On **September 18, 2013,** defense counsel reported to Erie his discussions with Dr. Snyder in which Dr. Snyder stated that the ligament injury and the resulting surgery may be attributable to the 2009 accident and may cause some permanent residuals. DM1747.

34   On **September 23, 2013,** Erie also reviewed records subpoenaed from Orthopedic Surgery and Rehabilitation Associates (Rehab Associates), indicating that Camiolo was enjoying "excellent progress" with significant improvement to the pain in his left hand, that he had "no current complaints." DM1766-68; N.T. 05.22.17 at 36; N.T. 06.29.17 at 101.

35   Dr. Gillon discharged Camiolo "PRN"[7] in **September of 2013.** DM0619-20; N.T. 05.18.17 at 19.

36   On or about **October 3, 2013,** defense counsel provided to plaintiff's counsel Dr. Snyder's written IME report of his August 5, 2013, independent medical exam. N.T. 06.29.17 at 88.

---

[6] Triangular Fibrocartilage Complex refers to the ligamentous and cartilaginous structures that suspend the distal radius and ulnar carpus from the distal ulna. Injuries to the TFCC present as ulnar-side wrist pain. Medscape [https://emedicine.medscape.com/article/1240789-overview].

[7] *Pro re nata*: Latin for the present matter; under present circumstances; as needed —abbreviation prn —used in medical prescriptions. Miriam Webster (URL: https://www.merriam-webster.com/dictionary/pro%20re%20nata).

7

On **October 3, 2013**, defense counsel transmitted to plaintiff's counsel a **new offer of $35,000**, which was rejected with no counteroffer a week later. DM0626; DM1343; N.T. 05.16.17 at 74; N.T. 05.18.17 at 77-78; N.T. 05.22.17 at 37-38.

## OFFER OF OCTOBER 30, 2013 ($36,750)

Having received additional information from the plaintiff about $1,750 in wage loss, Erie increased its **October 8, 2013, offer to $36,750**. DM2607; DM2046; N.T. 05.18.17 at 79; N.T. 05.22.17 at 42; N.T. 06.29.17 at 109.

## OFFER OF JANUARY 15, 2014 ($60,000)

In his **October 24, 2013**, deposition, Dr. Gillon testified that Camiolo experienced a good recovery after both surgeries; he also acknowledged Camiolo's pre-existing ulnar neuropathy. DM0619-20.

On **November 12, 2013**, however, plaintiff's counsel notified defense counsel that Camiolo had suffered a recent setback to his injuries while helping his aunt move to a new residence. DM0803.

On **November 27, 2013**, defense counsel reported to Erie that Dr. Gillon had examined Camiolo again and concluded that he indeed had suffered a relapse and loss of grip strength and that he might need injections in the future. DM1396.

On **December 13, 2013**, defense counsel received Dr. Gillon's December 3, 2013, supplemental report stating that: (a) Camiolo had been doing well until two months prior; (b) he had started regressing; (c) Dr. Gillon recommended that Camiolo wear a wrist brace; (d) there was no guarantee that Camiolo would be pain free for the rest of his life; and (e) if the pain was "extremely severe," Camiolo may need additional surgery. DM1397; N.T. 05.22.17 at 40, 52-54.

8

43 On **December 23, 2013**, Dr. Snyder was deposed.

44 On **January 10, 2014**, following Dr. Gillon's supplemental deposition on that day, Erie's file notes recount that Camiolo: (a) now had a different prognosis than he had at the time of his discharge in September of 2013; (b) had undergone a wrist injection on December 11, 2013; (c) suffered a relapse that was triggered when helping his aunt move; (d) possibly will require further treatment, including bone shortening surgery as "a last resort;" and € may suffer recurring pain throughout his life. DM1433; N.T. 05.16.17 at 79-82; N.T. 05.18.17 at 112-13.

45 On the basis of the foregoing, defense counsel opined that Erie's offer should be closer to the plaintiff's demand. DM1687.

46 On **January 15, 2014**, **Erie increased its offer to $60,000**. DM2046. It was rejected with no counteroffer on January 20, 2014. DM1440; N.T. 05.18.17 at 86-89; N.T. 05.22.17 at 56-57.

## OFFER OF FEBRUARY 7, 2014 ($100,000)

47 On or about **January 24, 2014**, plaintiff produced for the first time a journal dating back to December of 2012 noting that his current symptoms were comparable to those he experienced when he was first injured four years earlier. DM2008; N.T. 05.18.17 at 18; N.T. 06.29.17 at 120.

48 On **January 29, 2014**, the Camiolo's attorney advised defense counsel that Camiolo had seen Dr. Gillon that same day, that the strength in Camiolo's left hand had regressed even further, and that Dr. Gillon had ordered an MR Arthrogram.[8] DM2597; N.T. 05.16.17 at 8-9; N.T. 05.22.17 at 59, 110.

---

[8] An arthrogram is the "[i]maging of a joint following the introduction of a contrast agent into the joint capsule to enhance visualization of the intra-articular structures." Farlex Partner Medical Dictionary © Farlex 2012, https://medical-dictionary.thefreedictionary.com/arthrogram.

Based on the foregoing new information, Erie offered the $100,000 UIM policy limits on February 7, 2014, which Camiolo accepted. DM1646; N.T. 05.18.17 at 97.

## CONCLUSIONS OF LAW

50 Erie never denied plaintiff's UIM claim.

51 The record contains no clear and convincing evidence that during the period April 1, 2013, to February 7, 2014, Erie:

-failed to communicate with its insured or his counsel;

-failed to investigate;

-caused an unreasonable delay in handling the plaintiff's claim; or

-lacked a reasonable basis for any of its settlement offers.

52 In short, the record contains no clear and convincing evidence that Erie did not have reasonable basis for denying benefits[9] under policy and knew or recklessly disregarded any lack of a reasonable basis in negotiating the settlement of the plaintiff's claim.

53 On the basis of the foregoing record, and as explained in the discussion below, the court finds that plaintiff has failed to establish that Erie acted in bad faith in violation of Pennsylvania's Bad Faith Statute in the period from April 1, 2013, until February 7, 2014, when Erie offered and Camiolo accepted the policy limits.

---

[9] The claim was never "denied." Only the valuation was disputed.

10

## DISCUSSION

### I. INTRODUCTION

#### A. UIM INSURANCE

Underinsured motor vehicle (UIM) coverage is governed by the *Motor Vehicle Financial Responsibility Law* (MVFRL). 75 Pa. Stat. and Cons. Stat. Ann. § 1701-1799.7 (West). The statute contemplates that when the policy applicable to the vehicle which is at fault in causing claimant's injuries contains liability coverage that is insufficient to fully compensate the victim, the victim may seek coverage under his own policy if it provides for underinsured motorist coverage. *Wolgemuth v. Harleysville Mut. Ins. Co.*, 535 A.2d 1145, 1149 (Pa. Super. 1988). In this case, plaintiff Camiolo's claim against Erie for the benefits of the UIM coverage in his policy was premised on the inadequacy of the $50,000 he obtained in his action against the tortfeasor. Even though Erie never denied UIM coverage, Camiolo claims that Erie's handling of his claim was so deficient as to constitute statutory "bad faith."

Insurance providers are bound by a duty to afford good faith and fair dealing when handling the claims of their own insureds. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. 2002). Insureds may bring claims against their carriers pursuant to Pennsylvania's Bad Faith Statue, 42 Pa. Stat. and Cons. Stat. Ann. § 8371, the purpose of which is to provide a statutory remedy to an insured when an insurer denies benefits in bad faith. *General Acc. Ins. Co. v. Federal Kemper Ins. Co.*, 682 A.2d 819 (Pa. Super. 1996).

Erie's liability for coverage of injuries sustained in the 2009 accident is not the issue in this case. Instead, the dispute revolves around Erie's valuation of Camiolo's injuries in the period between April 1, 2013, and February 7, 2014. *Williams v. Hartford Cas. Ins. Co.*, 83 F.

11

Supp. 2d 567, 571–72 (E.D. Pa. 2000), *aff'd*, 261 F.3d 495 (3d Cir. 2001) (noting that even though liability is uncontested, the carrier's duty of good faith extends to its investigation of the claim's value). For the purposes of examining Erie's decisions during this time, the court bears in mind that insurance carriers handle UIM claims as in the nature of a third-party claim. *Zappile v. Amex Assur. Co.*, 928 A.2d 251, 255–56 (Pa. Super. 2007), *citing Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143-45 (Pa. Super. 2006) (acknowledging the inherently adversarial nature of first party claims); *Bonenberger*, 791 A.2d at 381 (observing that in a direct claim against one's own insurer, the parties may be expected to have differing positions on the claims' value).

## B. STATUTORY BAD FAITH

To succeed in a bad faith claim against an insurer, the insured must present clear and convincing evidence that: (1) the insurer did not have a reasonable basis for denying benefits under the policy, and (2) the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. *Rankosky v. Washington National Ins. Co.*, No. 28 WAP 2016 (Pa. September 28, 2017), slip op at 2.[10] The first prong of the claim requires an objective determination tested by the inquiry whether under the facts and circumstances of the case a reasonable insurer would have denied or delayed payment of benefits. *Rankosky*, No. 28 WAP 2016, *slip op.* at 17-18. Accordingly, bad faith may be established with proof of an unfounded refusal to pay, lack of investigation, and failure to communicate with insured. *Condio*, 899 A.2d at 1143; *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 630 (W.D. Pa. 2014); *compare*

---

[10] The court also held that "proof of an insurance company's motive of self-interest or ill-will is not a prerequisite to prevailing in a bad faith claim under Section 8371 . . . ." *Rankosky*, No. 28 WAP 2016, Slip Op. at 2.

12

*Bonenberger*, 791 A.2d at 380-81 (affirming a finding of bad faith in evidence that the carrier failed to order an independent medical exam or to consider the medical records).

As a threshold matter, the court finds that inasmuch as Erie never denied the claim outright, there is no "unfounded refusal to pay." There can also be no serious claim that there was a "lack of investigation" or that there was a "failure to communicate with the insured." Erie's voluminous, continuous and detailed claim file on Camiolo's case, along with the testimony of those responsible for handling his claim, tell a different story. Conversely, where the claim's value is uncertain, as it was in this case, Erie cannot be faulted for conducting a thorough investigation. *Lublin v. Am. Fin. Grp., Inc.*, 960 F. Supp. 2d 534, 541 (E.D. Pa. 2013) (observing that "[i]nvestigative efforts are not unreasonable when the claim's value is ambiguous). By all accounts, Erie's investigation was vigorous; it sought and received numerous medical records, ordered independent medical examinations and sought to reconcile often conflicting or changing information, all the time communicating with the claimant and his attorney.

Instead, Camiolo contends he has satisfied his burden under the first prong of the test by demonstrating that Erie did not have a reasonable basis for its negotiating position at any time during the ten month period at issue. First, he posits that the ten months it took for Erie to move from its offer of $7,500 to the policy limit of $100,000 constitutes a bad faith delay. Second, he argues that bad faith is evidenced by Erie's consistent undervaluation of his claim in face of medical evidence requiring a different result. The court addresses these arguments in turn, mindful that the focus of this fact-intensive inquiry is the conduct of insurer *vis a vis* insured. *Williams v. Nationwide Ins. Co., Inc.* 750 A.2d 881, 887 (Pa. Super. 2000).

13

## (a) On plaintiff's contention that bad faith must be inferred from Erie's delay in processing his claim.

Delay in processing a claim, standing alone, does not establish bad faith. *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011) (a period of delay between demand and settlement does not, standing alone, constitute bad faith). In this case, the court finds no support on the record for inferring bad faith from "delays" occurring after April 1, 2013. There is no support either in the law or on the record for the proposition that ten months, or even more, is inherently unreasonable. *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) (holding that where the carrier was actively engaged in investigation, valuations and negotiations, a twelve month delay did not evidence bad faith); *Williams*, 83 F. Supp. 2d at 571–72 (fifteen month delay not unreasonable where value of the claim was uncertain); *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 591-92 (ED Pa. 1999) (rejecting a bad faith claim premised on evidence of a one-year delay where the value of the claim was uncertain and where the delay was not caused by the carrier, but by the unavailability of information about the insured).

When viewed in light of all the facts and circumstances, the ten-month negotiation period under examination cannot be deemed unreasonable. It is undisputed that Camiolo's treatment was off-again and on-again throughout this period, substantiating Erie's observation that Camiolo's claim, from a medical standpoint, was a "fluid file" with ongoing developments that complicated the evaluation process. N.T. 05.16.17 at 37; N.T. 07.10.17 at 112 (defense counsel characterizing Camiolo's case as a "moving target"); *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 508 (Pa. Super. 2004) (opining that the "reasonableness" of valuation may consider that a three-year old claim has been "in flux" until only four months before

14

settlement). On April 1, 2013, the medical record before Erie showed that Camiolo was in treatment and that the nature and extent of his injuries were evolving. In October of 2012, Erie learned that Camiolo had been in a second accident that may have aggravated the injuries he sustained in 2009. It was not until June 6, 2013, that Erie learned that Camiolo had undergone a second surgery three months earlier, in March (the March 2013 Wrist Surgery). FF Para. 22. In response to this information, and without the benefit of medical records confirming that surgery, Erie raised its offer to $15,000. FF Paras. 20-28, above.

In pursuit of medical verification Erie ordered an IME that was performed in August. The IME confirmed that the March 2013 Wrist Surgery was accident-related. Within two weeks, Erie raised its offer again. In September, despite some ambiguity regarding Camiolo's medical status,[11] Erie credited Dr. Snyder's opinion that "permanent residuals" were likely, and once again increased its offer, this time to $25,000. DM1747; FF Paras. 29-30.

Then, within a month after receiving Dr. Gillon's report that Camiolo had suffered a relapse, that his symptoms were regressing, that he might suffer pain for the rest of his life, and that he might need additional surgery, Erie increased the offer again. FF Para. 44, above. Finally, when Erie offered the policy limits on February 7, 2013, it was within days of learning of Camiolo's even further regression and that in response Dr. Gillon had ordered an MR Arthrogram. FF Paras. 47-49.

Each step of the way, Erie acknowledged and credited new information and responded accordingly. While Camiolo may dispute the reasonableness of Erie's valuations, he has no

---

[11] Orthopedic Surgery and Rehabilitation Associates had reported on September 23, 2013, that Camiolo enjoyed "excellent progress" and "had no complaints." DM1776.

15

basis for inferring bad faith from the lapse of time between April 1, 2013, and February 7, 2014.

### (b) On plaintiff's contention that other evidence supports a bad faith claim.

As already stated, low but reasonable valuations do not amount to bad faith. *Johnson v. Progressive Inc. Co.*, 987 A.2d 781, 785 (Pa. Super. 2009) (noting that where there is only a dispute as to the measure of damages in a first party claim, a low, but reasonable valuation, will not support a claim of bad faith); *Seto*, 855 F. Supp. 2d 424; *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680, 688-89 (Pa. Super. 1994) (finding that where questions exist regarding value, low settlement offers do not support a bad faith claim). Moreover, no insurance company is obligated to tender the policy limits without an evaluative process comparable to that used in a third-party claim. *Condio*, 899 A.2d at 1145 (observing that a carrier's duty of good faith does not "require an insurer to sacrifice its own interest by blindly paying each and every claim submitted by an insured . . .").

Camiolo nevertheless argues that an inference of bad faith is supported by evidence: (a) of Erie's low valuations;[12] (b) that Erie ordered a second IME; (c) that Erie asked Dr. Snyder to defer writing his report on the August, 2013, examination; (d) that Erie impermissibly credited itself twice with the $50,000 that Camiolo received in the third-party settlement; and (e) that Erie has a policy not to "negotiate against itself" where, as here, the insured never counter-offers. As discussed below, the court finds that none of these contentions has merit, either on its own or together with the others.

---

[12] The record contains no evidence that Camiolo documented any claim for future medical expenses. Day 4 at 63.

### (i) On plaintiff's contention that bad faith must be inferred because Erie's offers were unsupported by the medical evidence.

The plaintiff argues that since there was no medical basis for its offers, Erie exhibited bad faith. First, he says that the valuation behind outstanding offer of $7,500, on April 1, 2013, lacked sufficient medical evidence and, therefore, was patently unreasonable. Second, and more particularly, he contends that in its June 27, 2013, offer of $15,000, Erie failed to consider his March 2013 Wrist Surgery. These facts, asserts the plaintiff, show that Erie acted unreasonably. The court rejects both contentions.

Regarding the offer of $7,500 that remained outstanding on April 1, 2017,[13] there is little dispute regarding the abundance of medical history in Erie's files on that date. FF Paras. 21-23. Further, the court credits Erie's evidence, including testimony at trial, considered Camiolo's medical history, the fact that his treatment was ongoing, and conducted jury verdict research to guide its valuation. On the basis the research, Erie estimated that the total value for Camiolo's injuries fell in a range of $50,000 and $75,000. After discounting the $50,000 Camiolo received in his third-party claim, Erie offered $7,500, based on total value of $57,500. FF Paras. 20-23. Reasonable minds might differ on whether this was a fair assessment of Camiolo's injuries in April 2013. The court, cannot deduce from the record, however, that the offer was without support or that Erie was unreasonable in awaiting further information about Camiolo's ongoing treatment.

---

[13] The court does not consider any implication that this number, formulated well before April 1, 2013, was the product of pre-April bad faith conduct on the part of Erie. Camiolo's burden is to show with clear and convincing evidence that Erie engaged in bad faith after April 1, 2013.

The second argument -- that Erie ignored Camiolo's March 2013 Wrist Surgery when making its June 27, 2013, offer of $15,000 -- is patently baseless. The evidence is that the June offer actually was triggered by notice of the March 2013 Wrist Surgery. FF Paras. 24-28. Since Erie had only *notice* of the surgery, it was not unreasonable to reserve judgment until a medical assessment was available. When Erie received that assessment from Dr. Snyder, Erie increased the offer again. FF Paras. 30-32. The court finds that Erie articulated a plausible basis for its valuation and cannot find any hint of bad faith in this course of events.

### (ii) On plaintiff's contention that bad faith must be inferred from Erie's request for a second independent medical examination.

Plaintiff argues that bad faith must be inferred from the fact that Erie ordered a second independent medical examinations, even though normally it does not do so.[14] On this ground, he need show only that the Erie's conduct lacked any reasonable basis. *Id.* This he was unable to do.

The accident was on June 30, 2009. The first IME on February 28, 2011, was ordered in order to establish what PIP benefits Camiolo was owed. The second IME was performed on August 5, 2013, two and half years after the first. In between the two examinations, Erie's files showed an on-again off-again treatment history, including additional surgery in March of 2011 (elbow) and then again in March of 2013 (wrist). Further, these two medical events bracketed a second automobile accident. Erie ordered the second IME expressly to address the implications of the March 2013 Wrist Surgery and under all the facts and circumstances of the

---

[14] In this argument, Camiolo appears to have considered an request for a second IME to be evidence of ill motive. This is no longer a claimant's burden, however. *Rankosky*, supra.

18

claim history, the court finds no basis to question the reasonableness of Erie's judgment, more than four years after the 2009 accident, that another IME was warranted.

### (iii) On plaintiff's contention that bad faith must be inferred from Erie's deferral of Snyder's written report.

**Deferred writing.** It is undisputed that defense counsel asked Dr. Snyder to defer writing the report of his August 5, 2013. IME, and that the report was not written and produced until October of 2013. N.T. 07.10.17 at 107. This, says Camiolo, is clear and convincing evidence that Erie deliberately withheld vital information from the plaintiff for the purpose of unfairly handicapping him in negotiations. In addition, he argues that the failure to produce the IME report in accordance with Pa.R.C.P. No. 4010 was a procedural defect that in itself requires a finding of bad faith.

Regarding the decision to defer the writing of the IME report, Erie's defense counsel testified that they had hoped to settle the matter without having to incur the extra litigation cost associated with preparing a report for litigation. 06.29.17 at 89, 94-95; 07.10.17 at 104, 107. Indeed, defense counsel instructed Dr. Snyder finally to write up the report only after a pre-trial conference had been scheduled. *Id.*

The court finds the testimony to be credible in light of the events following Dr. Snyder's August of 2013 IME. A month before that examination, Erie reviewed Dr. Gillon's May of 2013 opinion that (a) the March 2013 Wrist Surgery was due to the 2009 accident and (b) that Camiolo was expected to make a full recovery, with partial disability for six months. DM1677. Since the March 2013 Wrist Surgery itself was at odds with Dr. Gillon's 2012 report that Camiolo's prognosis was excellent and that he would not need surgery, it was reasonable

19

for Erie to order the IME that was conducted on August 9, 2013. On the basis of Snyder's verbal report, additional jury verdict research, and defense counsel's recommendation. Erie increased its offer $25,000. on August 9, 2013, representing a total recovery in a range of $75,000 to $80,000. DM1702; DM1687; N.T. 05.22.17 at 32. Erie advised plaintiff's counsel, this offer was based on, among other things, Dr. Snyder's conclusion that *Camiolo was correct* in his contention that the 2009 accident and the March 2013 Wrist Surgery were related.

In further discussions on September 18, 2013, Dr. Snyder confirmed to defense counsel his opinion that not only was the March 2013 Wrist Surgery related to the 2009 accident, but also that the surgery "may cause some permanent residuals."[15] DM1747. Yet, at the same time, as already mentioned, Rehab Associates reported on September 23, 2013, that Camiolo was enjoying "excellent progress" and had "no complaints." DM1766. Despite the ambiguity presented by the Rehab Associates' records, Erie increased the offer to $35,000 on October 8, 2013, at which time plaintiff's counsel had Dr. Snyder's written report in hand. DM0626.

Accordingly, the court finds no basis to doubt the testimony of defense counsel that his decision delaying the request for a written report was a matter of a trial strategy to contain costs. Nor does the court have any basis to reject the testimony of the Erie representative that Erie's offers did not depend on receiving a written IME report. N.T. 05.22.17 at 120. It

---

[15] The October 3, 2013, report the Dr. Snyder wrote indicated that the TFCC [wrist] tear was "surgically resolved" in March of 2013.

**Rule 4010.** Next, however, plaintiff claims that a bad faith finding is commanded by the fact that defense counsel violated Pa.R.C.P. No. 4010 in failing to produce a copy of a written IME report for plaintiff in the course of litigation. Rule 4010 provides, among other things, that a written report of a physical examination shall be provided to the opposing party, upon request.[16] Accordingly, there is a duty in litigation to produce the findings of an IME for the opposing party. The rule does not, however, specify a time frame for delivery of a report. Instead, it authorizes a court, upon motion, to enter a remedial order if such a report is not produced. The record is clear that plaintiff's counsel failed at any time from August to October to file a motion for an order compelling its production or seeking exclusion as a sanction. Erie cannot be faulted for relying on such an expectation in litigation. And, since this court has credited defense counsel's reason for deferring the report, it can find no basis in fact or in law for declaring that a putative violation of Rule 4010[17] amounts to clear and convincing evidence of bad faith.

### (iv) On plaintiff's contention that bad faith must be inferred from a calculation giving Erie double credit for the settlement in the UIM claim.

Next, Camiolo argues that bad faith may be inferred from Erie's method of calculation. Camiolo asserts that there were two injuries and that Erie valued each injury separately, but failed to aggregate their total value before discounting the $50,000 in settlement monies.

---

[16] Specifically, Pa.R.C.P. No. 4010 provides "[i]" requested by the party against whom an order is made under this rule or the person examined, the party causing the examination to be made shall deliver to the requesting party or person a copy of a detailed written report of the examiner setting out the examiner's findings, including results of all tests made, diagnoses and conclusions. . . . The court on motion may make an order against a party requiring delivery of a report on such terms as are just, and if an examiner fails or refuses to make a report the court shall exclude the examiner's testimony if offered at trial." Pa.R.C.P. No. 4010(b)(1).

[17] The rule does not prescribe a delivery time and expressly authorizes a motion to compel delivery if the opposing party is dissatisfied. Since no such motion was filed, it is not even clear that there was a "violation."

21

Specifically, plaintiff argues that "[i]f [Erie] had done the calculation properly there would have been $50,000.00 to $75,000.00 for the ulnar nerve injury plus $85,000 to $90,000 for the TFCC [wrist] injury or a combined range of $135,000.00 to $165,000.00 less $50,000 leaving a net combined range of $85,000.00 to $115,000.00." *Plaintiff's, Paul Camiolo, Brief Re: The Liability Phase of the Trial*, at [un-paginated] page 22.

The court credits the testimony of Erie's representative on this subject and rejects plaintiff's characterization of Erie's method of valuing the UIM claim because it is inconsistent with the evidence of record. First, Erie's representative testified clearly that upon learning of the results of Dr. Snyder's IME in September, the offer of $35,000 was based on the *entire* claim, including counsel's recommendation and verdict research. DM1747; DM1363. N.T. 05.15.17 at 104-05. She testified that the range for the total value of the left ulnar injury fell between $50,000 and $75,000; discounting the $50,000 settlement funds thus produced a range for Erie's liability for the **UIM portion of $0 to $20,000 (ulnar nerve)**. N.T. 05.15.17 at 109-10. Similarly, the range of the total value of the TFCC ligament repair was $80,000 to $90,000, yielding a **UIM portion of $30,000 to $40,000 (TFCC repair)**. Thus, the total valuation for the **UIM liability was in the range of $30,000 to $60,000**. The offer of $35,000 on October 3, 2013, fell within that range and, as explained earlier, was not so unreasonable as to support a bad faith claim.

(v) <u>On plaintiff's contention that bad faith must be inferred from Erie's negotiating posture in face of an insured's unyielding policy limits demand.</u>

Plaintiff challenges as indicative of bad faith the testimony of an Erie representative that the insurer resists negotiating against itself where, as here, the insured responds to offers

22

with no counter demand and never retreats from his demand from the policy limits. Plaintiff's interpretation of this bit of testimony from Erie is counterintuitive. First, any good negotiator routinely resists the efforts of an opponent to get him or her to increase offers without the prospect of concomitant counteroffer. In managing a UIM claim, it is perfectly reasonable for Erie to handle its negotiations as it would any third-party claim. *Zappile*, 92 A.2d 255-56 (stating that UIM claims are inherently adversarial); *Condio*, 899 A.2d at 1145 (stating that insurers are not obligated to make unquestioned payments on claims). Second, regardless of any "policy" on the matter, Erie in fact negotiated against itself when making successively greater offers in face of Camiolo's unyielding demand for the policy limits. Thus, under the facts and circumstances of this case, the evidence of Erie's negotiating posture is probative of nothing of consequence, much less of the existence of statutory bad faith.

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, and the attendant discussion, the court finds in favor of the defendant Erie and against plaintiff Camiolo on plaintiff's claim of statutory bad faith.

BY THE COURT:

_____
MARY D. COLINS, J.

DATE: ___3  7_____

23

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL SECTION

| | |
|---|---|
| **PAUL CAMIOLO,** | :    **JULY TERM, 2015** |
| *Plaintiff* | : |
| | : |
| v. | :    No.   1750 |
| | : |
| **ERIE INSURANCE EXCHANGE d/b/a** | : |
| **ERIE INSURANCE GROUP a/k/a ERIE** | : |
| **INSURANCE COMPANY a/k/a ERIE** | : |
| **INDEMNITY COMPANY,** | : |
| | : |
| *Defendant* | :    Findings of Fact/Conclusions of Law |
| | : |

## MEMORANDUM AND ORDER

**Colins, J.**                                        **October, 2017**

In July of 2015, plaintiff Paul Camiolo (Camiolo) filed a lawsuit against his insurer, Erie Insurance Exchange[1] (Erie), charging Erie with statutory bad faith in its handling of his underinsured motorist (UIM) claim. The matter was tried before this court on six days between May 15, 2017, and July 10, 2017.

The court has reviewed the notes of testimony and the exhibits admitted to the record, along with the parties' respective proposed findings of fact, conclusions of law, and memoranda. Having evaluated the evidence and adjudged the credibility of all the witnesses, the court finds in accordance with the findings of fact (FF) and conclusions of law set forth

Camiolo Vs Erie Insurance Exchange Etal-ORDMI



15070175000147

---

[1] d/b/a Erie Insurance Group a/k/a Erie Insurance Company a/k/a Erie Indemnity Company.

1

below that the plaintiff has failed to establish his bad faith claim by clear and convincing evidence. Accordingly, a verdict is entered in favor of the defendant Erie.

## FINDINGS OF FACT

1   On **June 30, 2009**, plaintiff Paul Camiolo (Camiolo) was involved a in motor vehicle accident in which his car was struck from behind by a vehicle driven by Weiwen Zhgen (Zhgen). Defendant Exhibit 1 (D-1) at CMS 2.

2   Camiolo filed a lawsuit against Zhen that was settled in Camiolo's favor on **March, 14, 2012**, for $50,000. N.T. 5/18/17 at 29.[2]

3   Camiolo was an insured by Erie under a Personal Auto Policy No. Q06-0115735 (Erie Policy) for the period of June 1, 2009 to June 1, 2010. DM0257-88.

4   On the day of Camiolo's accident, the Erie Policy provided $100,000 in Underinsured Motorist (UIM) coverage. *Id.*

5   In a **February 28, 2011**, report of his independent medical exam (IME) performed in connection with Camilo's July of 2009 claim for first party medical benefits (PIP), Dr. William H. Kirkpatrick stated:

> "However, I cannot clearly relate this condition [left cubital tunnel syndrome[3]] to his motor vehicle accident of nearly 2 years ago. He did not sustain any left elbow injury at the time of the motor vehicle accident. His symptoms were localized to left hand and wrist. Furthermore, progressive ulnar nerve[4]

---

[2] This action included bad faith claims that were dismissed by Stipulation in March of 2013. P-8.

[3] "Cubital Tunnel Syndrome is a condition that involves pressure or stretching of the ulnar nerve (also known as the "funny bone" nerve), which can cause numbness or tingling in the ring and small fingers, pain in the forearm, and/or weakness in the hand. The ulnar nerve runs in a groove on the inner side of the elbow." American Society for Surgery of the Hand [http://www.assh.org/handcare/hand-arm-conditions/cubital-tunnel].

[4] The ulnar nerve is "a large superficial nerve of the arm that is a continuation of the medial cord of the brachial plexus, passes around the elbow superficially in a groove between the olecranon and the medial epicondyle of the humerus, and continues down the inner side of the forearm to supply the skin and muscles of the little-finger side of the forearm and hand." Miriam Webster [https://www.merriam-webster.com/medical/ulnar%20nerve]/

2

symptoms can be related to his employment as a computer consultant and can also be related to his newly diagnosed diabetes.

As stated, I cannot relate treatment for this cubital tunnel syndrome specifically to the motor vehicle accident."

DM0166; CMS0006.

6  In a letter dated **April 5, 2012**, Camiolo's attorney notified Erie of his UIM claim and presented a demand package seeking the policy limit of $100,000. DM0514-22.

7  In a report dated **October 12, 2012**, Dr. Thomas J. Gillon, Camiolo's treating surgeon, opined that the injuries to Camiolo's wrist and elbow were sustained in the accident in June of 2009. DM1289-90.

8  Dr. Gillon noted that about seven months earlier, on March 15, 2011, and after Dr. Kirkpatrick's February exam, Camiolo "underwent a left elbow ulnar nerve release in situ with medial epicondylectomy." (March 2011 Elbow Surgery). *Id.*

9  Three months after this surgery, Camiolo was in an auto accident involving a collision with a deer (deer accident). This incident aggravated symptoms of numbness and tingling in left fingers stemming from the ulnar neuropathy, but that these symptoms did "dissipate over time without any intervention." *Id.*

10  Dr. Gillon opined that Camiolo's symptoms, post-operative and post-deer-accident, were "not permanent and continue to get better as time goes on;" this conclusion was affirmed by the results of a new EMG and nerve conduction study from September 28, 2012. *Id.*

11  Dr. Gillon stated that Camiolo would "still have some numbness in his small finger for an additional six months but I think it should get better to the point where it does not bother him any longer unless he develops a generalized motor and sensory peripheral neuropathy from his diabetes, which would be unrelated to his compressive neuropathy at the elbow." *Id.*

3

He stated further that Camiolo did not need further surgery, that he had "an excellent prognosis with respect to his left elbow ulnar neuropathy" and that he had "no functional deficits or disability with respect to his left elbow or hand from his ulnar neuropathy." *Id.*

In a **June 13, 2012,** conference call with defense counsel, Dr. Kirkpatrick acknowledged that he could not, to a reasonable degree of medical certainty, reject Dr. Gillon's opinion that Camiolo's injuries were related to the 2009 accident. DM0676.

In **March of 2013,** Erie received from defense counsel information that jury verdict research regarding the value of an ulnar nerve injury revealed that the claim had a total value of $50,000 to $75,000. DM1250-51; N.T. 05.22.17 at 23.

As of **April 1, 2013,** Erie's initial offer on Camiolo's UIM claim after taking credit for the $50,000 settlement remained at $7,500. DM2117.

Ten months later, in **February of 2014,** Erie tendered and Camiolo accepted the policy limits of $100,000. N.T. 5/18/17 at 30.

On **February 19, 2014,** Camiolo executed a General Release Agreement that included the following statement:

> "It is expressly understood and agreed that I, Paul Camiolo, my heirs, representatives, executors, administrators, successors, and assigns am/are not releasing the release from any and all claims of bad faith accruing from **April 1, 2013, to the present.**"

DM 1664-65 (emphasis added).

In the ten months between April 1, 2013, and February 7, 2014, the date of the final settlement, Erie increased its original $7,500 offer six times: **June 27, 2013 ($15,000)** (DM1673); **August 15, 2013 ($25,000)** (DM1702); **October 8, 2013 ($35,000)** (DM0626); **October 30, 2013 ($36,750)** (DM2607); **January 15, 2014 ($60,000)** (DM2046); and

4

**February 7, 2014 ($100,000)** (DM1646). At no point during negotiations did Camiolo abandon his $100,000 demand.

In **July of 2015**, Camiolo filed the instant lawsuit charging Erie with statutory bad faith under 42 Pa. Stat. and Cons. Stat. Ann. § 8371 (West).[5]

## OFFER OF JUNE 27, 2013 ($15,000)

On **March 26, 2013**, through its counsel, Erie advised Camiolo's attorney that the then outstanding offer of $7,500 remained in place because the insurer had received no new evidence, documents or facts that warranted an increase. DM2117-18; N.T. 05.16.17 at 31, 35; N.T. 05.18.17 at 122; N.T. 06.29.17 at 59.

This number assumed that (a) Camiolo's injuries were caused by the 2009 accident and (b) that the total value of Camiolo's claim was between $50,000 and $70,000, which, when discounting the $50,000 received in settlement from the tortfeasor, produced a range for Erie's liability of $0 to $20,000. DM1250; N.T. 05.15.17 at 91.

At this point, Erie had reviewed extensive medical records for Camiolo dating back to 1997, including the report of the independent medical exam performed on February 28, 2011, by Dr. Kirkpatrick and the October 12, 2012, report of Dr. Gillon. DM0185-88; DM1284; DM1312-31. N.T. 05.15.17 at 78-79; N.T. 05.16.17 at 32; N.T. 05.22.17 at 26-27.

Dr. Gillon had related Camiolo's injuries to the 2009 accident. Dr. Kirkpatrick had conceded that he could not refute Dr. Gillon's opinion on causation. FF Para. 5, *supra.*

---

[5] Section 8371 provides, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

On **June 6, 2013**, Erie received additional information during Camiolo's lawsuit against the tortfeasor. Discovery revealed the new information that, notwithstanding Dr. Gillon's prognosis to the contrary in October of 2012, Camiolo had had *additional surgery* on his left wrist in March of 2013 (March 2013 Wrist Surgery), two months earlier and three years and nine months after the initial accident. CMS0307; DM1673; Day1 at 89; N.T. 05.18.17 at 110-11.

Dr. Gillon opined further that the March 2013 Wrist Surgery was causally related to the 2009 accident and that Camiolo would be partially disabled from employment for approximately six months, but was expected to make a full recovery. CMS0283-85; DM0658.

On **June 27, 2013**, having reviewed this new information, Erie increased its offer to **$15,000**, citing Erie's "continuing duty to re-evaluate," and noting that even though Erie did not yet have the medical records of the surgery, "an additional surgery [in March 2013] is a significant intervening development." DM1272; DM0658; DM1673; N.T. 05.15.17 at 91; N.T. 05.18.17 at 56; N.T. 05.22.17 at 27-29; N.T. 06.29.17 at 64.

## OFFER OF AUGUST 15, 2013 ($25,000)

Having increased its offer to $15,000, Erie determined that it needed further medical investigation of causation regarding the March 2013 Wrist Surgery. N.T. 05.22.17 at 29-30.

On **August 5, 2013**, Dr. Barry Snyder performed an independent medical examination of Camiolo to determine if the March 2013 Wrist Surgery was related to the 2009 accident. DM1687; DM1702; N.T. 05.18.17 at 62.

6

31    Snyder opined that Camiolo's TFCC[6] repair (the March 2013 Wrist Surgery) was "likely attributable" to the 2009 accident, that his treatment had "not matured," and that Camiolo would "never return to 100 percent functionality." DM1687-89; N.T. 05.15.17 at 94; N.T. 05.18.17 at 64; N.T. 05.22.17 at 120.

32    On **August 15, 2013,** on the basis Snyder's opinion, Erie increased its offer to Camiolo to **$25,000,** premised on a total recovery of $75,000 to $80,000. *Id.;* DM1702; N.T. 05.15.17 at 95-96; N.T. 05.16.17 at 66; N.T. 05.18.17 at 66, 72; N.T. 05.22.17 at 29-30.

## OFFER OF OCTOBER 3, 2013 ($35,000)

33    On **September 18, 2013,** defense counsel reported to Erie his discussions with Dr. Snyder in which Dr. Snyder stated that the ligament injury and the resulting surgery may be attributable to the 2009 accident and may cause some permanent residuals. DM1747.

34    On **September 23, 2013,** Erie also reviewed records subpoenaed from Orthopedic Surgery and Rehabilitation Associates (Rehab Associates), indicating that Camiolo was enjoying "excellent progress" with significant improvement to the pain in his left hand, that he had "no current complaints." DM1766-68; N.T. 05.22.17 at 36; N.T. 06.29.17 at 101.

35    Dr. Gillon discharged Camiolo "PRN"[7] in **September of 2013.** DM0619-20; N.T. 05.18.17 at 19.

36    On or about **October 3, 2013,** defense counsel provided to plaintiff's counsel Dr. Snyder's written IME report of his August 5, 2013, independent medical exam. N.T. 06.29.17 at 88.

---

[6] Triangular Fibrocartilage Complex refers to the ligamentous and cartilaginous structures that suspend the distal radius and ulnar carpus from the distal ulna. Injuries to the TFCC present as ulnar-side wrist pain. Medscape [https://emedicine.medscape.com/article/1240789-overview].

[7] *Pro re nata.* Latin for the present matter; under present circumstances; as needed —abbreviation prn —used in medical prescriptions. Miriam Webster (URL: https://www.merriam-webster.com/dictionary/pro%20re%20nata).

7

On **October 3, 2013**, defense counsel transmitted to plaintiff's counsel a new offer of $35,000, which was rejected with no counteroffer a week later. DM0626; DM1343; N.T. 05.16.17 at 74; N.T. 05.18.17 at 77-78; N.T. 05.22.17 at 37-38.

## OFFER OF OCTOBER 30, 2013 ($36,750)

Having received additional information from the plaintiff about $1,750 in wage loss, Erie increased its **October 8, 2013, offer to $36,750.** DM2607; DM2046; N.T. 05.18.17 at 79; N.T. 05.22.17 at 42; N.T. 06.29.17 at 109.

## OFFER OF JANUARY 15, 2014 ($60,000)

In his **October 24, 2013**, deposition, Dr. Gillon testified that Camiolo experienced a good recovery after both surgeries; he also acknowledged Camiolo's pre-existing ulnar neuropathy. DM0619-20.

On **November 12, 2013**, however, plaintiff's counsel notified defense counsel that Camiolo had suffered a recent setback to his injuries while helping his aunt move to a new residence. DM0803.

On **November 27, 2013**, defense counsel reported to Erie that Dr. Gillon had examined Camiolo again and concluded that he indeed had suffered a relapse and loss of grip strength and that he might need injections in the future. DM1396.

On **December 13, 2013**, defense counsel received Dr. Gillon's December 3, 2013, supplemental report stating that: (a) Camiolo had been doing well until two months prior; (b) he had started regressing; (c) Dr. Gillon recommended that Camiolo wear a wrist brace; (d) there was no guarantee that Camiolo would be pain free for the rest of his life; and (e) if the pain was "extremely severe," Camiolo may need additional surgery. DM1397; N.T. 05.22.17 at 40, 52-54.

8

43    On **December 23, 2013**, Dr. Snyder was deposed.

44    On **January 10, 2014**, following Dr. Gillon's supplemental deposition on that day, Erie's file notes recount that Camiolo: (a) now had a different prognosis than he had at the time of his discharge in September of 2013; (b) had undergone a wrist injection on December 11, 2013; (c) suffered a relapse that was triggered when helping his aunt move; (d) possibly will require further treatment, including bone shortening surgery as "a last resort;" and €  may suffer recurring pain throughout his life. DM1433; N.T. 05.16.17 at 79-82; N.T. 05.18.17 at 112-13.

45    On the basis of the foregoing, defense counsel opined that Erie's offer should be closer to the plaintiff's demand. DM1687.

46    On **January 15, 2014, Erie increased its offer to $60,000**. DM2046. It was rejected with no counteroffer on January 20, 2014. DM1440; N.T. 05.18.17 at 86-89; N.T. 05.22.17 at 56-57.

## OFFER OF FEBRUARY 7, 2014 ($100,000)

47    On or about **January 24, 2014**, plaintiff produced for the first time a journal dating back to December of 2012 noting that his current symptoms were comparable to those he experienced when he was first injured four years earlier. DM2008; N.T. 05.18.17 at 18; N.T. 06.29.17 at 120.

48    On **January 29, 2014**, the Camiolo's attorney advised defense counsel that Camiolo had seen Dr. Gillon that same day, that the strength in Camiolo's left hand had regressed even further, and that Dr. Gillon had ordered an MR Arthrogram.[8] DM2597; N.T. 05.16.17 at 8-9; N.T. 05.22.17 at 59, 110.

---

[8] An arthrogram is the "[i]maging of a joint following the introduction of a contrast agent into the joint capsule to enhance visualization of the intra-articular structures." Farlex Partner Medical Dictionary © Farlex 2012, https://medical- dictionary.thefreedictionary.com/arthrogram.

9

Based on the foregoing new information, Erie offered the **$100,000 UIM policy limits on February 7, 2014**, which Camiolo accepted. DM1646; N.T. 05.18.17 at 97.

## CONCLUSIONS OF LAW

Erie never denied plaintiff's UIM claim.

The record contains no clear and convincing evidence that during the period April 1, 2013, to February 7, 2014, Erie:

-failed to communicate with its insured or his counsel;

-failed to investigate;

-caused an unreasonable delay in handling the plaintiff's claim; or

-lacked a reasonable basis for any of its settlement offers.

In short, the record contains no clear and convincing evidence that Erie did not have reasonable basis for denying benefits[9] under policy and knew or recklessly disregarded any lack of a reasonable basis in negotiating the settlement of the plaintiff's claim.

On the basis of the foregoing record, and as explained in the discussion below, the court finds that plaintiff has failed to establish that Erie acted in bad faith in violation of Pennsylvania's Bad Faith Statute in the period from April 1, 2013, until February 7, 2014, when Erie offered and Camiolo accepted the policy limits.

---

[9] The claim was never "denied." Only the valuation was disputed.

10

## DISCUSSION

### I.   INTRODUCTION

#### A.  UIM INSURANCE

Underinsured motor vehicle (UIM) coverage is governed by the *Motor Vehicle Financial Responsibility Law* (MVFRL). 75 Pa. Stat. and Cons. Stat. Ann. § 1701-1799.7 (West). The statute contemplates that when the policy applicable to the vehicle which is at fault in causing claimant's injuries contains liability coverage that is insufficient to fully compensate the victim, the victim may seek coverage under his own policy if it provides for underinsured motorist coverage. *Wolgemuth v. Harleysville Mut. Ins. Co.*, 535 A.2d 1145, 1149 (Pa. Super. 1988). In this case, plaintiff Camiolo's claim against Erie for the benefits of the UIM coverage in his policy was premised on the inadequacy of the $50,000 he obtained in his action against the tortfeasor. Even though Erie never denied UIM coverage, Camiolo claims that Erie's handling of his claim was so deficient as to constitute statutory "bad faith."

Insurance providers are bound by a duty to afford good faith and fair dealing when handling the claims of their own insureds. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. 2002). Insureds may bring claims against their carriers pursuant to Pennsylvania's Bad Faith Statue, 42 Pa. Stat. and Cons. Stat. Ann. § 8371, the purpose of which is to provide a statutory remedy to an insured when an insurer denies benefits in bad faith. *General Acc. Ins. Co. v. Federal Kemper Ins. Co.*, 682 A.2d 819 (Pa. Super.1996).

Erie's liability for coverage of injuries sustained in the 2009 accident is not the issue in this case. Instead, the dispute revolves around Erie's valuation of Camiolo's injuries in the period between April 1, 2013, and February 7, 2014. *Williams v. Hartford Cas. Ins. Co.*, 83 F.

11

Supp. 2d 567, 571–72 (E.D. Pa. 2000), *aff'd*, 261 F.3d 495 (3d Cir. 2001) (noting that even though liability is uncontested, the carrier's duty of good faith extends to its investigation of the claim's value). For the purposes of examining Erie's decisions during this time, the court bears in mind that insurance carriers handle UIM claims as in the nature of a third-party claim. *Zappile v. Amex Assur. Co.*, 928 A.2d 251, 255–56 (Pa. Super. 2007), *citing Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143-45 (Pa. Super. 2006) (acknowledging the inherently adversarial nature of first party claims); *Bonenberger*, 791 A.2d at 381 (observing that in a direct claim against one's own insurer, the parties may be expected to have differing positions on the claims' value).

## B. STATUTORY BAD FAITH

To succeed in a bad faith claim against an insurer, the insured must present clear and convincing evidence that: (1) the insurer did not have a reasonable basis for denying benefits under the policy, and (2) the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. *Rankosky v. Washington National Ins. Co.*, No. 28 WAP 2016 (Pa. September 28, 2017), slip op at 2.[10] The first prong of the claim requires an objective determination tested by the inquiry whether under the facts and circumstances of the case a reasonable insurer would have denied or delayed payment of benefits. *Rankosky*, No. 28 WAP 2016, *slip op.* at 17-18. Accordingly, bad faith may be established with proof of an unfounded refusal to pay, lack of investigation; and failure to communicate with insured. *Condio*, 899 A.2d at 1143; *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 630 (W.D. Pa. 2014); *compare*

---

[10] The court also held that "proof of an insurance company's motive of self-interest or ill-will is not a prerequisite to prevailing in a bad faith claim under Section 8371 . . . ." *Rankosky*, No. 28 WAP 2016, Slip Op. at 2.

12

*Bonenberger,* 791 A.2d at 380-81 (affirming a finding of bad faith in evidence that the carrier failed to order an independent medical exam or to consider the medical records).

As a threshold matter, the court finds that inasmuch as Erie never denied the claim outright, there is no "unfounded refusal to pay." There can also be no serious claim that there was a "lack of investigation" or that there was a "failure to communicate with the insured." Erie's voluminous, continuous and detailed claim file on Camiolo's case, along with the testimony of those responsible for handling his claim, tell a different story. Conversely, where the claim's value is uncertain, as it was in this case, Erie cannot be faulted for conducting a thorough investigation. *Lublin v. Am. Fin. Grp., Inc., 960* F. Supp. 2d 534, 541 (E.D. Pa. 2013) (observing that "[i]nvestigative efforts are not unreasonable when the claim's value is ambiguous). By all accounts, Erie's investigation was vigorous; it sought and received numerous medical records, ordered independent medical examinations and sought to reconcile often conflicting or changing information, all the time communicating with the claimant and his attorney.

Instead, Camiolo contends he has satisfied his burden under the first prong of the test by demonstrating that Erie did not have a reasonable basis for its negotiating position at any time during the ten month period at issue. First, he posits that the ten months it took for Erie to move from its offer of $7,500 to the policy limit of $100,000 constitutes a bad faith delay. Second, he argues that bad faith is evidenced by Erie's consistent undervaluation of his claim in face of medical evidence requiring a different result. The court addresses these arguments in turn, mindful that the focus of this fact-intensive inquiry is the conduct of insurer *vis a vis* insured. *Williams v. Nationwide Ins. Co., Inc.* 750 A.2d 881, 887 (Pa. Super. 2000).

13

**(a) On plaintiff's contention that bad faith must be inferred from Erie's delay in processing his claim.**

Delay in processing a claim, standing alone, does not establish bad faith. *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011) (a period of delay between demand and settlement does not, standing alone, constitute bad faith). In this case, the court finds no support on the record for inferring bad faith from "delays" occurring after April 1, 2013. There is no support either in the law or on the record for the proposition that ten months, or even more, is inherently unreasonable. *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) (holding that where the carrier was actively engaged in investigation, valuations and negotiations, a twelve month delay did not evidence bad faith); *Williams*, 83 F. Supp. 2d at 571–72 (fifteen month delay not unreasonable where value of the claim was uncertain); *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 591-92 (ED Pa. 1999) (rejecting a bad faith claim premised on evidence of a one-year delay where the value of the claim was uncertain and where the delay was not caused by the carrier, but by the unavailability of information about the insured).

When viewed in light of all the facts and circumstances, the ten-month negotiation period under examination cannot be deemed unreasonable. It is undisputed that Camiolo's treatment was off-again and on-again throughout this period, substantiating Erie's observation that Camiolo's claim, from a medical standpoint, was a "fluid file" with ongoing developments that complicated the evaluation process. N.T. 05.16.17 at 37; N.T. 07.10.17 at 112 (defense counsel characterizing Camiolo's case as a "moving target"); *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 508 (Pa. Super. 2004) (opining that the "reasonableness" of valuation may consider that a three-year old claim has been "in flux" until only four months before

14

settlement). On April 1, 2013, the medical record before Erie showed that Camiolo was in treatment and that the nature and extent of his injuries were evolving. In October of 2012, Erie learned that Camiolo had been in a second accident that may have aggravated the injuries he sustained in 2009. It was not until June 6, 2013, that Erie learned that Camiolo had undergone a second surgery three months earlier, in March (the March 2013 Wrist Surgery). FF Para. 22. In response to this information, and without the benefit of medical records confirming that surgery, Erie raised its offer to $15,000. FF Paras. 20-28, above.

In pursuit of medical verification Erie ordered an IME that was performed in August. The IME confirmed that the March 2013 Wrist Surgery was accident-related. Within two weeks, Erie raised its offer again. In September, despite some ambiguity regarding Camiolo's medical status,[11] Erie credited Dr. Snyder's opinion that "permanent residuals" were likely, and once again increased its offer, this time to $25,000. DM1747; FF Paras. 29-30.

Then, within a month after receiving Dr. Gillon's report that Camiolo had suffered a relapse, that his symptoms were regressing, that he might suffer pain for the rest of his life, and that he might need additional surgery, Erie increased the offer again. FF Para. 44, above. Finally, when Erie offered the policy limits on February 7, 2013, it was within days of learning of Camiolo's even further regression and that in response Dr. Gillon had ordered an MR Arthrogram. FF Paras. 47-49.

Each step of the way, Erie acknowledged and credited new information and responded accordingly. While Camiolo may dispute the reasonableness of Erie's valuations, he has no

---

[11] Orthopedic Surgery and Rehabilitation Associates had reported on September 23, 2013, that Camiolo enjoyed "excellent progress" and "had no complaints." DM1776.

15

basis for inferring bad faith from the lapse of time between April 1, 2013, and February 7, 2014.

### (b) On plaintiff's contention that other evidence supports a bad faith claim.

As already stated, low but reasonable valuations do not amount to bad faith. *Johnson v. Progressive Inc. Co.*, 987 A.2d 781, 785 (Pa. Super. 2009) (noting that where there is only a dispute as to the measure of damages in a first party claim, a low, but reasonable valuation, will not support a claim of bad faith); *Seto*, 855 F. Supp. 2d 424; *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680, 688-89 (Pa. Super. 1994) (finding that where questions exist regarding value, low settlement offers do not support a bad faith claim). Moreover, no insurance company is obligated to tender the policy limits without an evaluative process comparable to that used in a third-party claim. *Condio*, 899 A.2d at 1145 (observing that a carrier's duty of good faith does not "require an insurer to sacrifice its own interest by blindly paying each and every claim submitted by an insured ... .").

Camiolo nevertheless argues that an inference of bad faith is supported by evidence: (a) of Erie's low valuations;[12] (b) that Erie ordered a second IME; (c) that Erie asked Dr. Snyder to defer writing his report on the August, 2013, examination; (d) that Erie impermissibly credited itself twice with the $50,000 that Camiolo received in the third-party settlement; and (e) that Erie has a policy not to "negotiate against itself" where, as here, the insured never counter-offers. As discussed below, the court finds that none of these contentions has merit, either on its own or together with the others.

---

[12] The record contains no evidence that Camiolo documented any claim for future medical expenses. Day 4 at 63.

16

**(i) On plaintiff's contention that bad faith must be inferred because Erie's offers were unsupported by the medical evidence.**

The plaintiff argues that since there was no medical basis for its offers, Erie exhibited bad faith. First, he says that the valuation behind outstanding offer of $7,500, on April 1, 2013, lacked sufficient medical evidence and, therefore, was patently unreasonable. Second, and more particularly, he contends that in its June 27, 2013, offer of $15,000, Erie failed to consider his March 2013 Wrist Surgery. These facts, asserts the plaintiff, show that Erie acted unreasonably. The court rejects both contentions.

Regarding the offer of $7,500 that remained outstanding on April 1, 2017,[13] there is little dispute regarding the abundance of medical history in Erie's files on that date. FF Paras. 21-23. Further, the court credits Erie's evidence, including testimony at trial, considered Camiolo's medical history, the fact that his treatment was ongoing, and conducted jury verdict research to guide its valuation. On the basis the research, Erie estimated that the total value for Camiolo's injuries fell in a range of $50,000 and $75,000. After discounting the $50,000 Camiolo received in his third-party claim, Erie offered $7,500, based on total value of $57,500. FF Paras. 20-23. Reasonable minds might differ on whether this was a fair assessment of Camiolo's injuries in April 2013. The court, cannot deduce from the record, however, that the offer was without support or that Erie was unreasonable in awaiting further information about Camiolo's ongoing treatment.

---

[13] The court does not consider any implication that this number, formulated well before April 1, 2013, was the product of pre-April bad faith conduct on the part of Erie. Camiolo's burden is to show with clear and convincing evidence that Erie engaged in bad faith after April 1, 2013.

17

The second argument -- that Erie ignored Camiolo's March 2013 Wrist Surgery when making its June 27, 2013, offer of $15,000 -- is patently baseless. The evidence is that the June offer actually was triggered by notice of the March 2013 Wrist Surgery. FF Paras. 24-28. Since Erie had only *notice* of the surgery, it was not unreasonable to reserve judgment until a medical assessment was available. When Erie received that assessment from Dr. Snyder, Erie increased the offer again. FF Paras. 30-32. The court finds that Erie articulated a plausible basis for its valuation and cannot find any hint of bad faith in this course of events.

### (ii)   On plaintiff's contention that bad faith must be inferred from Erie's request for a second independent medical examination.

Plaintiff argues that bad faith must be inferred from the fact that Erie ordered a second independent medical examinations, even though normally it does not do so.[14] On this ground, he need show only that the Erie's conduct lacked any reasonable basis. *Id.* This he was unable to do.

The accident was on June 30, 2009. The first IME on February 28, 2011, was ordered in order to establish what PIP benefits Camiolo was owed. The second IME was performed on August 5, 2013, two and half years after the first. In between the two examinations, Erie's files showed an on-again off-again treatment history, including additional surgery in March of 2011 (elbow) and then again in March of 2013 (wrist). Further, these two medical events bracketed a second automobile accident. Erie ordered the second IME expressly to address the implications of the March 2013 Wrist Surgery and under all the facts and circumstances of the

---

[14] In this argument, Camiolo appears to have considered an request for a second IME to be evidence of ill motive. This is no longer a claimant's burden, however. *Rankosky*, supra.

18

claim history, the court finds no basis to question the reasonableness of Erie's judgment, more than four years after the 2009 accident, that another IME was warranted.

(iii) <b><u>On plaintiff's contention that bad faith must be inferred from Erie's deferral of Snyder's written report.</u></b>

**Deferred writing.** It is undisputed that defense counsel asked Dr. Snyder to defer writing the report of his August 5, 2013, IME, and that the report was not written and produced until October of 2013. N.T. 07.10.17 at 107. This, says Camiolo, is clear and convincing evidence that Erie deliberately withheld vital information from the plaintiff for the purpose of unfairly handicapping him in negotiations. In addition, he argues that the failure to produce the IME report in accordance with Pa.R.C.P. No. 4010 was a procedural defect that in itself requires a finding of bad faith.

Regarding the decision to defer the writing of the IME report, Erie's defense counsel testified that they had hoped to settle the matter without having to incur the extra litigation cost associated with preparing a report for litigation. 06.29.17 at 89, 94-95; 07.10.17 at 104, 107. Indeed, defense counsel instructed Dr. Snyder finally to write up the report only after a pre-trial conference had been scheduled. *Id.*

The court finds the testimony to be credible in light of the events following Dr. Snyder's August of 2013 IME. A month before that examination, Erie reviewed Dr. Gillon's May of 2013 opinion that (a) the March 2013 Wrist Surgery was due to the 2009 accident and (b) that Camiolo was expected to make a full recovery, with partial disability for six months. DM1677. Since the March 2013 Wrist Surgery itself was at odds with Dr. Gillon's 2012 report that Camiolo's prognosis was excellent and that he would not need surgery, it was reasonable

19

for Erie to order the IME that was conducted on August 9, 2013. On the basis of Snyder's verbal report, additional jury verdict research, and defense counsel's recommendation, Erie increased its offer $25,000, on August 9, 2013, representing a total recovery in a range of $75,000 to $80,000. DM1702; DM1687; N.T. 05.22.17 at 32. Erie advised plaintiff's counsel, this offer was based on, among other things, Dr. Snyder's conclusion that *Camiolo was correct* in his contention that the 2009 accident and the March 2013 Wrist Surgery were related.

In further discussions on September 18, 2013, Dr. Snyder confirmed to defense counsel his opinion that not only was the March 2013 Wrist Surgery related to the 2009 accident, but also that the surgery "may cause some permanent residuals."[15] DM1747. Yet, at the same time, as already mentioned, Rehab Associates reported on September 23, 2013, that Camiolo was enjoying "excellent progress" and had "no complaints." DM1766. Despite the ambiguity presented by the Rehab Associates' records, Erie increased the offer to $35,000 on October 8, 2013, at which time plaintiff's counsel had Dr. Snyder's written report in hand. DM0626.

Accordingly, the court finds no basis to doubt the testimony of defense counsel that his decision delaying the request for a written report was a matter of a trial strategy to contain costs. Nor does the court have any basis to reject the testimony of the Erie representative that Erie's offers did not depend on receiving a written IME report. N.T. 05.22.17 at 120. It

---

[15] The October 3, 2013, report the Dr. Snyder wrote indicated that the TFCC [wrist] tear was "surgically resolved" in March of 2013.

20

**Rule 4010.** Next, however, plaintiff claims that a bad faith finding is commanded by the fact that defense counsel violated Pa.R.C.P. No. 4010 in failing to produce a copy of a written IME report for plaintiff in the course of litigation. Rule 4010 provides, among other things, that a written report of a physical examination shall be provided to the opposing party, upon request.[16] Accordingly, there is a duty in litigation to produce the findings of an IME for the opposing party. The rule does not, however, specify a time frame for delivery of a report. Instead, it authorizes a court, upon motion, to enter a remedial order if such a report is not produced. The record is clear that plaintiff's counsel failed at any time from August to October to file a motion for an order compelling its production or seeking exclusion as a sanction. Erie cannot be faulted for relying on such an expectation in litigation. And, since this court has credited defense counsel's reason for deferring the report, it can find no basis in fact or in law for declaring that a putative violation of Rule 4010[17] amounts to clear and convincing evidence of bad faith.

**(iv)**     <u>On plaintiff's contention that bad faith must be inferred from a calculation giving Erie double credit for the settlement in the UIM claim.</u>

Next, Camiolo argues that bad faith may be inferred from Erie's method of calculation. Camiolo asserts that there were two injuries and that Erie valued each injury separately, but failed to aggregate their total value before discounting the $50,000 in settlement monies.

---

[16] Specifically, Pa.R.C.P. No. 4010 provides "[i]" requested by the party against whom an order is made under this rule or the person examined, the party causing the examination to be made shall deliver to the requesting party or person a copy of a detailed written report of the examiner setting out the examiner's findings, including results of all tests made, diagnoses and conclusions, . . . The court on motion may make an order against a party requiring delivery of a report on such terms as are just, and if an examiner fails or refuses to make a report the court shall exclude the examiner's testimony if offered at trial." Pa.R.C.P. No. 4010(b)(1).

[17] The rule does not prescribe a delivery time and expressly authorizes a motion to compel delivery if the opposing party is dissatisfied. Since no such motion was filed, it is not even clear that there was a "violation."

21

Specifically, plaintiff argues that "[i]f [Erie] had done the calculation properly there would have been $50,000.00 to $75,000.00 for the ulnar nerve injury plus $85,000 to $90,000 for the TFCC [wrist] injury or a combined range of $135,000.00 to $165,000.00 less $50,000 leaving a net combined range of $85,000.00 to $115,000.00." *Plaintiff's, Paul Camiolo, Brief Re: The Liability Phase of the Trial,* at [un-paginated] page 22.

The court credits the testimony of Erie's representative on this subject and rejects plaintiff's characterization of Erie's method of valuing the UIM claim because it is inconsistent with the evidence of record. First, Erie's representative testified clearly that upon learning of the results of Dr. Snyder's IME in September, the offer of $35,000 was based on the *entire* claim, including counsel's recommendation and verdict research. DM1747; DM1363. N.T. 05.15.17 at 104-05. She testified that the range for the total value of the left ulnar injury fell between $50,000 and $75,000; discounting the $50,000 settlement funds thus produced a range for Erie's liability for the **UIM portion of $0 to $20,000 (ulnar nerve)**. N.T. 05.15.17 at 109-10. Similarly, the range of the total value of the TFCC ligament repair was $80,000 to $90,000, yielding a **UIM portion of $30,000 to $40,000 (TFCC repair)**. Thus, the total valuation for the **UIM liability was** in the range of **$30,000 to $60,000**. The offer of $35,000 on October 3, 2013, fell within that range and, as explained earlier, was not so unreasonable as to support a bad faith claim.

(v) **On plaintiff's contention that bad faith must be inferred from Erie's negotiating posture in face of an insured's unyielding policy limits demand.**

Plaintiff challenges as indicative of bad faith the testimony of an Erie representative that the insurer resists negotiating against itself where, as here, the insured responds to offers

22

with no counter demand and never retreats from his demand from the policy limits. Plaintiff's interpretation of this bit of testimony from Erie is counterintuitive. First, any good negotiator routinely resists the efforts of an opponent to get him or her to increase offers without the prospect of concomitant counteroffer. In managing a UIM claim, it is perfectly reasonable for Erie to handle its negotiations as it would any third-party claim. *Zappile*, 92 A.2d 255-56 (stating that UIM claims are inherently adversarial); *Condio*, 899 A.2d at 1145 (stating that insurers are not obligated to make unquestioned payments on claims). Second, regardless of any "policy" on the matter, Erie in fact negotiated against itself when making successively greater offers in face of Camiolo's unyielding demand for the policy limits. Thus, under the facts and circumstances of this case, the evidence of Erie's negotiating posture is probative of nothing of consequence, much less of the existence of statutory bad faith.

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, and the attendant discussion, the court finds in favor of the defendant Erie and against plaintiff Camiolo on plaintiff's claim of statutory bad faith.

BY THE COURT:

_____
**MARY D. COLINS, J.**

DATE: _____3  7_____

23